**SAVE OUR SPRINGS, et al.**

v.

**Bruce BABBITT, Secretary of the Department of the Interior.**

**No. MO–96–CA–168.**

United States District Court, W.D. Texas, Midland–Odessa Division.

March 25, 1997.

Amy R. Johnson, Henry, Lorre, Hess and Frederick, Austin, TX, William G. Bunch, SOS Legal Defense Fund, Austin, TX, for plaintiffs.

Mark A. Brown, Environment & Natural Resources, U.S. Dept. of Justice, Washington, DC, Tonianne Baca, Dept. of Interior, Albuquerque, NM, Monica Burke, Dept. of Interior, Office of Solicitor, Washington, DC, for defendant.

Louis S. Zimmerman, Fulbright & Jaworski, Austin, TX, pro hac vice, for Nat. Ass'n of Home Builders, Texas Capital Area Builders Ass'n, amicus.

## ORDER

BUNTON, Senior District Judge.

**BEFORE THE COURT,** in the above-captioned cause of action, are the parties's cross motions for summary judgment. The parties have thoroughly briefed the issues currently before the Court. After considering the parties' arguments and the material contained in the Administrative Record as a whole, the Court enters its Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. This citizen enforcement action was filed by Plaintiffs Save Our Springs and Dr. Mark Kirkpatrick on October 29, 1996, pursuant to the Endangered Species Act. 16 U.S.C. §§ 1531, *et seq.* The action challenges Defendant Bruce Babbitt's, Secretary of the Department of the Interior (Secretary), decision to withdraw the proposed listing of the Barton Springs salamander (*Eurycea sosorum*). This action, for judicial review of a final agency action, is governed by the Administrative Procedures Act. 5 U.S.C. §§ 552, *et seq.* Plaintiffs served notice of intent to sue on the Secretary on July 26, 1996.

2. The Barton Springs salamander ("salamander") is a small, aquatic salamander that evolved in isolation from other salamander species. It lives at Barton Springs Austin's Zilker Park and is found naturally nowhere else in the world. 61 Fed.Reg. 46609. The salamander is a neotenic, meaning it does not metamorphose into an adult terrestrial form like other amphibians and retains its bright red external gills throughout its life. It remains in and reproduces in the aquatic form, and cannot escape any adverse conditions in Barton Springs. The salamander depends on a constant supply of clean, flowing water from Barton Springs. 61 Fed.Reg. 46608. "The very restricted range of the Barton Springs salamander makes this species especially vulnerable to acute and/or cumulative groundwater contamination." *Id.* at 46615.

3. Captive breeding of the species has not been successful. Captive propagation of the salamander has been initiated at the Dallas Aquarium in Texas and at the National Biological Service's Midwest Science Center in Missouri. Although each facility has had one successful spawning, hatching success was less than eight percent. *Id.* at 46609.

4. On December 30, 1982, the Department of Interior recognized that information then available indicated that the Barton Springs salamander might be endangered or threatened, and listed the species as a "category 2" candidate for listing. 47 Fed.Reg. 58454, 58455.

5. On January 22, 1992, Dr. Mark Kirkpatrick, a Professor of Zoology at the University of Texas at Austin, and Barbara Mahler, a doctoral candidate in geology at the University of Texas researching pollutant transport in limestone aquifers, petitioned the U.S. Fish & Wildlife Service to list the Barton Springs salamander as endangered and to designate critical habitat for the species. 59 Fed.Reg. 7970.

6. The filing of the petition triggered a duty for the Secretary to "make a finding as to whether the petition present[ed] substantial scientific or commercial information indicating that the petitioned action [might be] warranted," and "[t] o the maximum extent practicable, within 90 days after receiving the petition" to publish this finding in the Federal Register. 16 U.S.C. § 1533(b)(3)(A).

7. On December 11, 1992, more than three hundred days later, the Secretary "determined that the petition presented information on threats indicating that the requested action may be warranted" and published no-

tice of this determination in the Federal Register. 57 Fed.Reg. 58779. The Secretary was then required, not later than January 22, 1993, to determine whether listing of the species was warranted. 16 U.S.C. § 1533(b)(3)(B). The Secretary missed this deadline. On February 17, 1994, more than twelve months after he was required by statute to act, the Secretary issued a Proposed Rule to list the salamander as "endangered" under the ESA. 59 Fed.Reg. 7968. The Proposed Rule listed the primary threat to the salamander as "contamination of the waters that feed Barton Springs due to the potential for catastrophic events (such as petroleum or chemical spills) and chronic degradation resulting from urban activities." *Id.* The Secretary also expressed concern over "disturbances to the salamander's surface habitat and reduced groundwater supplies resulting from increased groundwater withdrawals." Within a year of publication of the Proposed Rule, the Secretary then had a legal duty to make a final determination about the species. The Secretary could find that the species was endangered and list the species, that it was not endangered and withdraw the listing, or determine that there was substantial scientific disagreement regarding the sufficiency or accuracy of information about the species and extend the deadline for six months. 16 U.S.C. § 1533(b)(6). The Secretary "extended" the deadline for six months.

8. Kirkpatrick and Mahler sued Babbitt to compel him to make this decision. *See Save Our Springs Legal Defense Fund v. Babbitt,* MO–95–CA–230 (*"SOS I"*).

9. This Court found that the Secretary violated his nondiscretionary duty to act within the twelve month period when he missed the deadline. *See SOS I* (on or about November 27, 1995). This Court ordered the Secretary to act and he appealed that decision claiming that the listing moratorium that went into effect after he was to make his final decision but before the Court ordered him to act prevented him from taking any listing action. While that appeal was pending, the President waived the listing moratorium and the case was returned to this Court for further proceedings.

10. On remand, this Court again found the Secretary violated the provisions of the ESA and ordered him to make a final listing decision by August 30, 1996. On June 24, 1996, the Service reopened the comment period to ascertain whether any additional regulatory protection was offered by the State. That comment period was closed by Order of this Court on July 10, 1996. On the date the comment period closed, there was no additional regulatory protection offered by the State of Texas.

11. During the six month extension period biologists for the USFWS were preparing the final rule listing the salamander as endangered. A.R.–75 at 80. The biologists that prepared the final rule recommended that the usual thirty-day delay between the date of publication and its effective date be waived. The final rule was approved by the Southwest Regional Office of USFWS on or about August 8, 1996, and forwarded to Washington D.C. for final approval. A.R. – B81.

12. On June 24, 1996, representatives from the State of Texas met with officials from the Department of the Interior to discuss the Conservation Agreement. This is the only record on any meetings or discussion about the Conservation Agreement.

13. The "Barton Springs Salamander Conservation Agreement and Strategy" was signed on August 13, 1996. . 61 Fed.Reg. 46611. The signatories to the agreement are the Texas Parks and Wildlife Department ("TPWD"), the Texas Natural Resources Conservation Commission ("TNRCC") the Texas Department of Transportation ("TxDOT") and the Service. *Id.* at 46612. The signatories of the Conservation Agreement are those agencies with the responsibility, authority, and funding mechanisms to implement the provisions of the Agreement. *Id.*

14. The Secretary withdrew the Proposed Rule listing the salamander as "endangered" on September 4, 1996, stating that "the Service finds that information now available . . . justifies withdrawal of the proposed listing of this species as endangered." 61 Fed.Reg. 46608. The Secretary maintained that "because the commitment by the State of Texas

to fully implement the cooperative Agreement significantly reduces the risks to the species, the Service concludes that listing is no longer warranted." *Id.* However, prior to the signing of the Conservation Agreement, "the Service evaluated existing State and local regulatory mechanisms and [Best Management Practices] prior to preparing the proposed rule for listing the species. The service found evidence of inadequacy of existing regulatory mechanisms in 1994 and published the proposed rule with information on this factor." *Id.* at 46612. Those inadequacies included:

a. The failure of TPWD to list the salamander on the State's endangered species list, thus denying it the protection of that agency;

b. Ineffectiveness of State water quality rules and regulations to provide assurances of long-term water quality protection;

c. The absence of regulations prohibiting hazardous material transportation across the aquifer;

d. The absence of retrofit provisions for water quality control structures on existing roadways;

e. The failure of municipal water quality regulations to apply outside of the City of Austin's extraterritorial jurisdiction;

f. The failure of the State's "Edwards Rules" to apply to contributing zone, to address existing development, to prescribe site-specific water quality performance standards, to address the effects of cumulate impacts on water quality in the Aquifer, or to address land use or impervious cover. Further, none of the ordinances include retrofit provisions for existing developments or land use regulations and those ordinance in effect can be rendered ineffective by variance provisions and exemptions;

g. The absence of any legally enforceable commitment or incentive for the City of Austin to change its pool cleaning and maintenance to protect the salamander; and

h. The absence of regulatory authority over thirty to forty percent of groundwater pumping as well as only limited enforcement authority to control the pumping over which the regulatory authority does exist.

59 Fed.Reg. 7975, 7975–76.

15. Nothing significant appears in the record between the Secretary's 1994 statement regarding the concerns of Texas' statutory and regulatory scheme for protecting the species and the withdrawal of the proposed listing except the signing of the Conservation Agreement. Accordingly, the Court finds that the Conservation Agreement was the reason the Secretary's decision not to list the salamander.

16. The objectives of the Agreement are two-fold. "The main objective is to eliminate or significantly reduce the threats to the species. This includes eliminating risk of catastrophic events." The second objective is to establish a "captive breeding/refugium program in order to avoid extinction of the species should any potential threats actually cause the species to disappear in the wild." *Id.* at 46611.

17. In order to meet these objectives, agencies of the State of Texas are to take the following actions:

a. Enforcement and monitoring of compliance with existing regulations and adoption, implementation and enforcement of currently proposed regulations;

b. Prevention of catastrophic contaminant releases into the spring waters;

c. Prevention of degradation of the springhead habitat; establishment of a captive breeding program; and development of a better biological understanding of the salamander population. *Id.*

18. The State will additionally implement the following administrative action:

a. Coordination of conservation activities;

b. Implementation of the conservation schedule;

c. Funding of conservation actions; and

d. Assessment of the conservation progress. *Id.*

19. Because the Agreement was entered into after the public comment period was closed by this Court (and after the comment period would have been closed according to the Service's timetable), no public comment was allowed on the Conservation Agreement.

20. Pursuant to the Conservation Agreement, numerous actions are to be undertaken by the signatories. However, of the twenty-eight actions to be implemented immediately, this Court finds that none significantly reduce the immediate threats to the species. For example:

a. TPWD will:

    i. *establish* what the existing conditions are at Barton Springs Pool;

    ii. *work with* USFWS to assist the City of Austin in development & implementation of BMPs for pool maintenance;

    iii. *develop* conservation protocols for future activities

    iv. *implement* salamander population and habitat study;

    v. *recommend & organize* PVHA workshop for BSS;

    vi. *identify* methods for springflow protection

    vii. *identify* funding mechanisms.

b. The TNRCC and TPWD will initiate the following activities with respect to the Barton Creek watershed:

    i. *Implement* existing water quality compliance & monitoring

    ii. *Implement* proposed C & M regulations

    iii. *Review* SOS ordinance in support of state/local cooperation in water quality C & M efforts;

    iv. *Evaluate* existing spill response systems—identify changes

    v. *Identify* watershed funding mechanisms . . .

These are some of the activities that were to be taken immediately, and because this is a review on the record, the Court has no way of knowing whether or not they have been implemented. However, the terms and phrases "identify," "evaluate," "review," "develop," "work with" and "establish" used in the Conservation Agreement suggest to this Court that even if the activities have been fully implemented, they do not take any tangible steps to reduce the immediate threat to the species. *See* A.R. –B82 at 7 (Table 1).

21. The effect of the measures articulated in the Conservation Agreement on the species is speculative. There are no assurances that the measures will be carried out, when they will be carried out, nor whether they will be effective in eliminating the threats to the species.

22. Assuming arguendo that the Conservation Agreement measures will be carried out, the Agreement still fails to address the concerns espoused by the Secretary in 1994 when he reviewed Texas' existing regulatory mechanisms for protecting the species. For example, these concerns are not addressed and/or remedied by the Conservation Agreement:

a. Failure of TPWD to list the species as threatened or endangered;

b. Ineffectiveness of the State water quality rules and regulations to provide long-term water quality protection;

c. The absence of regulations prohibiting transportation of hazardous materials across the watershed;

d. The absence of retrofit provisions for water quality control structures on existing roadways;

e. The failure of municipal water quality regulations to apply outside of the City of Austin's extraterritorial jurisdiction;

f. The absence of any legally enforceable commitment or incentive for the City of Austin to change its pool cleaning and maintenance procedures to protect the salamander;

g. The failure of the State's "Edwards Rules" to apply to the contributing zone, to address existing development, to prescribe site-specific water quality

performance standards, to address land use or impervious cover;

h. The absence of regulatory authority over one-third of groundwater pumping as well as only limited enforcement authority to control the pumping over the regulatory authority does exist.

*Cf.* 59 Fed.Reg. At 7975–76 *with* A.R. –B82 (the Conservation Agreement).

23. During the period where the Secretary continued to gather information relevant to the listing decision, there were political measures taken to influence the listing decision as evidenced by:

a. February 14, 1995 letter from the Governor of the State of Texas expressing "deep concerns because the proposed action by the federal government may have the potential to impact the use of private property" of Texans. A.R. –B75 at 47.

b. The Secretary's Deputy Chief of Staff's, Susan Rieff, electronic mail that stated that the listing decision of the salamander was a "hot" issue (Jan. 18, 1995 e-mail message of USFWS Director Mollie Beattie);

c. A quote from the summary of the recommended final listing rule that stated "The Governor has shown considerable interest in the potential listing, the issue being sensitive politically among the State and local agencies.... An effort also exists in the development community to oppose listing." A.R. –B75 (summary sheet);

d. The summary goes on to state that "intense opposition to the listing and efforts to protect the Barton Springs watershed has been expressed by the State, the City of Dripping Springs, certain Congressional representatives and developer interests." *Id.;*

e. There are inferences that political lobbyists for the development community worked with political appointees of the Secretary. *See* A.R. –B179.

24. The Court finds that strong political pressure was applied to the Secretary to withdraw the proposed listing of the salamander.

25. After the President waived the moratorium on listing activities, the Southwest Regional Office of the United States Fish and Wildlife Service identified the salamander as the most endangered among species "deemed to face imminent, high magnitude threats" in Texas, New Mexico, Arizona and Oklahoma. *See* Pub.L. 104–134; A.R. –B44; *see also* 61 Fed.Reg. 32413–14, 38703. The Regional Office assigned the salamander the top priority in the region for listing stating that "the Service has received significant new information on the status of the Barton Springs salamander, indicating increased urgency for protection as a result of the ongoing drought in Central Texas." A.R. –B44 at 2.

26. Dr. Mark Kirkpatrick co-authored the petition to list the salamander. He has scientific, conservation and aesthetic interests in the protection of the salamander and its critical habitat. The Secretary's decision adversely affects Kirkpatrick's interests.

27. Save Our Springs Legal Defense Fund, Ltd. is a non-profit, public interest corporation devoted to the protection and enjoyment of the Barton Springs ecosystem and its resident fish, wildlife and plants. The SOS alliance represents board members and approximately 1,300 regular members. Some of its members enjoy observing the salamander. Further, its members' recreational, scientific, conservation and aesthetic interests in the salamander and its critical habitat (Barton Springs) will be adversely affected by the Secretary's final decision to delist the salamander.

28. On December 12, 1996, this Court granted Plaintiffs' Motion to Accelerate the Briefing Schedule of this case due to concerns over the adequacy of protection for the species. In the same order, the Court granted Defendant's Motion to Limit Review to the Administrative Record. *See* Court's Order dated December 12, 1996 (Clerk's Docket Number 13).

29. The Service's Listing Handbook provides that:

The Service may only receive and consider information on a proposed rule that is received during an open comment period.

Once the public comment period for a proposed rule closes, agency personnel associated with the listing decision are discouraged from engaging in activities or substantive discussions related to the rule making with anyone outside the Department.

30. The Service considered the Conservation Agreement that was entered into outside the comment period and no meaningful public participation was involved in the preparation of or signing of the Agreement. The Agreement was relevant and critical to the final listing decision.

*USFWS's Listing Handbook* at 65.

Based on the foregoing Findings of Fact, the Court makes the following Conclusions of Law.

## CONCLUSIONS OF LAW

■ 1. Plaintiff's Notice of Intent to Sue was served on the Secretary more than sixty days prior to suit being filed here. Thus, the Court finds that the Plaintiff complied with the notice provisions of the Endangered Species Act. 16 U.S.C. § 1540(g)(2)(C).

2. Kirkpatrick and Save Our Springs Alliance both have standing to bring a citizen suit under the Endangered Species Act. *See Brock v. Pierce County*, 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986); and *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392 (9th Cir.1995).

3. The Administrative Procedures Act ("APA") is applicable to this action. Accordingly, the scope of judicial review under the APA is limited. The reviewing Court shall hold unlawful and set aside agency action, findings, and conclusions found to be—

a. Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

b. Contrary to constitutional right power, privilege, or immunity;

. c. In excess of statutory jurisdiction, authority, or limitations, or show of statutory right;

d. Without observance of procedure required by law;

5 U.S.C. § 706(2).

■ 4. Summary judgment is appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record even though the Court does not employ the standard of review set forth Federal Rule of Civil Procedure 56. *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C. 1995).

5. An arbitrary and capricious analysis cannot be conducted under the APA without considering the relevant substantive statute—the ESA. *Oregon Natural Resources Council v. Thomas*, 92 F.3d 792 (1996).

6. And review under the APA applying the ESA is on the record as a whole. 5 U.S.C. § 706; *United States v. Menendez*, 48 F.3d 1401, 1409 (5th Cir.1995).

7. An "endangered" species is "any species which is in danger of extinction throughout all or a significant portion of its range. . . ." 16 U.S.C. § 1532(6). A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

8. Pursuant to the ESA, the Secretary determines whether a species is an endangered species according to the following factors:

a. The present or threatened destruction, modification, or curtailment of its habitat or range;

b. Over utilization for commercial, recreational, scientific, or educational purposes;

c. Disease or predation;

d. The inadequacy of existing regulatory mechanisms; or

e. Other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).

■ 9. Given the expertise of the USFWS in the area of wildlife conservation and management and the deferential stan-

dard of review, the Court begins with a strong presumption in favor of upholding decisions of the Service on the listing decisions. *See Marsh v. Oregon Nat. Resources Council,* 490 U.S. 360, 375–78, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Nevertheless, a reviewing court must undertake a "thorough, probing, in-depth review" of the agency's decision and then decide whether it was "based on the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ 10. The Court reviews *de novo* whether the Secretary's decision comports with the substantive requirements of the ESA and APA, that is, whether it was in accordance with the law. *Idaho Farm Bureau,* 58 F.3d at 1399.

11. The factors enumerated in the ESA to guide the Secretary in listing decisions are to be made solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and taking into account those efforts, if any, being made by the State to protect the species, including conservation practices. 16 U.S.C. § 1533(b)(1)(A).

12. The ESA requires the Secretary to disregard politics and to make listing decisions based solely on the best scientific and commercial data available. H.R.Rep. No 1625, 95th Cong., 2nd Sess. 13, *reprinted in* 1978 U.S.Code Cong. & Admin.News 9453, 9463 ("individuals charged with the administration of the act do not have the legal authority to weight the political importance of an endangered species.").

13. The ESA permits the Secretary to enter into Cooperative Agreements with State agencies for the protection and preservation of the species. The Act sets forth specific criteria for determining whether a Cooperative Agreement is adequate, and this Court finds that these factors are relevant in examining the Conservation Agreement in this case. In considering the adequacy of Conservation Agreement with the State, the Secretary must find, and annually thereafter reconfirm such finding, that under the State program:

a. Authority resides in the State agency to conserve resident species of fish or wildlife determined by the State agency or the Secretary to be endangered or threatened;

b. The State agency has established acceptable conservation programs, consistent with the purposes and policies of this chapter, for all resident species of fish and wildlife in the State which are deemed by the Secretary to be endangered or threatened, and has furnished a copy of such plan and program together with all pertinent details, information and data requested to the Secretary;

c. The State agency is authorized to conduct investigation to determine the status and requirements for survival of resident species of fish and wildlife;

d. The State agency is authorized to establish programs, including the acquisition of land or aquatic habitat or interests therein, for the conservation of resident endangered or threatened species of fish and wildlife; and

e. Provision is made for public participation in designating resident species of fish and wildlife as endangered or threatened. 16 U.S.C. §§ 1535(1)(A) *et seq.*

14. The ESA contains mechanisms for delisting a species in the event future developments remove the threats that led to the initial listing. 16 U.S.C. § 1533(c)(2).

15. Multiple places in the Conservation Agreement make reference to possible future actions of the State of Texas to protect the species. The Secretary cannot use promises of proposed future actions as an excuse for not making a determination based on the existing record.

■ 16. The Court finds as a matter of law that the Secretary violated the ESA when he failed to make an initial finding as to whether the petition to list presented substantial scientific or commercial information indicating that listing might be warranted within ninety days of receiving the petition to list filed by Kirkpatrick and Mahler. *See* 16

U.S.C. § 1533(b)(3)(A). The Secretary finally made this finding three hundred days after the deadline.

17. The Court finds as a matter of law that the Secretary violated the ESA when he failed to determine whether listing was warranted within twelve months of his initial finding. *See* 16 U.S.C. § 1533 (b)(3)(B). He finally issued a proposed rule to list the salamander more than twelve months after the ESA required him to act.

18. The Court finds as a matter of law that the Secretary violated the ESA when he missed the nondiscretionary twelve month deadline to either list, withdraw the proposed listing, or extend the period six additional months on February 17, 1995. He finally decided to extend the period on or about July 25, 1996.

19. The Court finds that the Secretary violated the ESA when he considered the Conservation Agreement in making his listing decision. There was no public comment concerning the Agreement and it was not entered into until the comment period closed. From the withdrawal notice, it is clear that the Secretary relied heavily on the provisions of the agreement on the assumption that:

a. they would be put into effect; and

b. They would be effective in eliminating the risk to the species.

20. The purpose of the comment period is permitting meaningful public comment on issues critical to the rule making process. *Idaho Farm Bureau,* 58 F.3d at 1404.

21. When the Secretary permitted an Agreement, with no proven track record for effectiveness in protecting the species, to play the pivotal role in his listing decision and when he considered political factors in making his listing decision, he acted arbitrarily and capriciously. Any listing decision that considers the Conservation Agreement will be deemed by this Court to be arbitrary and capricious until sufficient time has elapsed to permit the Secretary to determine its effectiveness in protecting the species. This Court considers a sufficient track record to be two years. If the Secretary then determines the Agreement will be effective in eliminating the threats to the species, he can delist the species—if in fact it has been listed.

22. The Secretary's reliance on facts outside the record coupled with the inability of interested persons to participate and comment on relevant matters critical to the final decision to withdraw the listing was not in compliance with the APA and ESA.

23. This Court finds as a matter of law that the Secretary's decision to withdraw the listing of the Barton Springs salamander was arbitrary and capricious and that the Secretary relied on factors other than those contemplated by the ESA.

24. This Court finds as a matter of law that the Secretary failed to follow proper procedures under the APA and ESA. He failed to allow comment on issues that were fundamental to his ultimate decision. He missed virtually every statutory deadline provided in the ESA. And he considered factors other than those contemplated by the ESA.

25. The Court finds that the Secretary should have only utilized the best scientific and commercial data available to make his decision.

## CONCLUSION

This Court does not desire to second guess the Secretary's final decision to withdraw the proposed listing. Nevertheless, Congress has provided exacting procedures for the Secretary to follow in making his listing decisions. Congress has mandated what the Secretary can and cannot consider under the ESA. This Court finds that the Secretary, during the entire listing procedure with respect to the species at issue here, failed to follow Congress' directives and missed every nondiscretionary statutory imposed deadline. Moreover, the Secretary placed the continued existence of a species, found only one place in the natural world, in the hands of state agencies and a Conservation Agreement with no proven track record for success. It may well come to pass that the Conservation Agreement passes with flying colors in its intended effect of eliminating the

risk to the species and is the best possible way to accomplish that aim. However, absent some historical data to back the decision that the Conservation Agreement is sufficient to adequately protect the species, it is arbitrary and capricious to conclude that at this time Accordingly,

**IT IS ORDERED** that judgment is entered in favor of Plaintiffs against Defendant Bruce Babbitt.

**IT IS FURTHER ORDERED** that costs are assessed against Defendant and Plaintiff shall recover their attorney's fees from the Defendant.

**IT IS FURTHER ORDERED** that this case is remanded to the Secretary to make a listing determination with respect to the Barton Springs salamander consistent with this opinion not later than thirty days from the date of this Order.

**IT IF FINALLY ORDERED** that all relief not herein granted is **DENIED.**