**FEDERATION OF FLY FISHERS, et al., Plaintiffs,**

v.

**William M. DALEY, Secretary of Commerce, et al., Defendants.**

**No. C 99–0981 SI.**

United States District Court, N.D. California.

Oct. 25, 2000.

Michael R. Sherwood, Earthjustice Legal Defense Fund, San Francisco, CA, for plaintiffs.

Robert S. Mueller, III, United States Attorney, James A. Coda, Assistant United States Attorney, Office of the United States Attorney, San Francisco, CA, for defendants.

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT, AND REMANDING TO DEFENDANT SECRETARY FOR FURTHER CONSIDERATION AND DECISION**

ILLSTON, District Judge.

On October 13, 2000, the Court heard argument on the parties' cross-motions for summary judgment. Having carefully considered the arguments of the parties and the papers submitted, the Court GRANTS plaintiffs' motion for summary judgment and DENIES defendants' cross-motion for summary judgment for the reasons set forth below.

## BACKGROUND

Plaintiffs Federation of Fly Fishers, et al. ("Fly Fishers")challenge a March 19, 1998 Final Rule by the Secretary of Commerce, acting through the National Marine Fisheries Service ("NMFS"), not to list the Klamath Mountains Province Evolutionarily Significant Unit ("ESU")of steelhead as a threatened species under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq. For purposes of listing under the ESA, a "species" is defined by geographical population segments called ESUs. Administrative Record ("AR")Ex. 15 at 3. The Klamath Mountains Province ESU of steelhead occupies river basins in the Elk River in southern Oregon through the Klamath River in Northern California. AR Ex. 1 at 13352. Steelhead (*Oncorhynchus mykiss*)are a salmonid species that occur on the west coast in two distinct genetic groups—coastal and inland. AR Ex. 1 at 13347. Steelhead can also be classified as winter-run or summer-run depending on their sexual maturity and spawning patterns. AR Ex. 1 at 13348, 13352. The Klamath Mountains Province ESU steelhead are coastal and include both winter-run and summer-run steelhead. AR Ex. 1 at 133352.

. In May 1992, several of the plaintiffs in this case submitted a petition to NMFS requesting that the winter-run steelhead occupying the Illinois River in southern Oregon be listed under the ESA. Plaintiffs' Motion 7. NMFS determined that the request "may be warranted" and directed its Biological Review Team ("BRT")to conduct a status review. AR Ex. 449 at 33939. The BRT determined that the Illinois River steelhead are part of a larger ESU, known as the Klamath Mountains

Province ESU. Defendants' Opposition 5. The BRT analyzed scientific data and historical and present conditions affecting the larger Klamath Mountains Province ESU. Plaintiffs' Motion at 7. The status review culminated in a report issued to NMFS in December 1994 ("1994 Status Report"). *Id.* The BRT stated that it was "unable to identify any steelhead populations that are naturally self-sustaining" within the Klamath Mountains Province ESU, and thus concluded, "steelhead within this ESU are likely to become endangered in the foreseeable future" if present conditions continue. *Id.;* Defendants' Motion 5.

In February 1994, a second petition was submitted to NMFS requesting listing of all west coast steelhead populations. Plaintiffs' Motion 7. NMFS again determined that the request to list "may be warranted." AR Ex. 230. NMFS stated that the petition would be incorporated into the on-going review of west coast steelhead populations it was already conducting.[1] Plaintiffs' Motion 7. The on-going review produced a comprehensive report issued in August 1996 assessing the biological status of steelhead populations in Washington, Idaho, Oregon, and California ("1996 Status Report"). AR Ex. 15.

The 1996 Status Report identified five ESUs of steelhead that were presently in danger of extinction and five ESUs that were likely to become endangered in the foreseeable future. AR Ex. 15 at vii. The Klamath Mountains Province ESU was identified among the ESUs likely to become endangered. *Id.* The BRT's determination was based on scientific conclusions and did not consider whether any then existing federal or state conservation efforts could ameliorate the decline in steelhead population. AR Ex. 15 at 4. Hence, the BRT did not give a recommendation as to whether the Klamath Mountains Province ESU should be *listed* as threatened.

On August 9, 1996, based on the 1996 Status Report, NMFS proposed to list the Klamath Mountains Province ESU as threatened, in addition to the nine other ESUs identified in the status report as endangered or threatened. NMFS based its Proposed Rule on the recognition that numerous efforts to halt the decline of the steelhead population were inadequate. AR Ex. 13 at 41556. On August 18, 1997, NMFS issued the Final Rule to list five of the ESUs in the proposed listing. AR Ex. 8 at 43974. The Klamath Mountains Province ESU was not among those listed. *Id.* Instead, final determination on the Klamath Mountains Province ESU along with the other ESUs not listed was postponed. NMFS invoked a six-month extension period because it found that a scientific disagreement existed regarding the proposed listing of these ESUs. AR Ex. 8 at 43974. The extension period allowed NMFS to collect and review new information received from California and Oregon since the 1996 status review. Plaintiff's Motion 8. NMFS additionally held public hearings and considered comments from a number of peer reviewers. *Id.*

The extended status review produced a third report concerning the Klamath Mountains Province ESU in December 1997 ("1997 Status Report"). AR Ex. 6. As with the first two status reports, the BRT gave scientific conclusions that the Klamath Mountains Province ESU is "likely to become endangered in the foreseeable future" if present trends continue. AR Ex. 6 at iv, 29. Having considered the BRT's status review, NMFS on March 19, 1998 issued the Final Rule. AR Ex. 1. NMFS declined to list the Klamath Mountains Province ESU as a threatened species and withdrew its 1996 Proposed Rule with respect to this ESU. AR Ex. 1 at 13347. NMFS reasoned that the Klamath Mountains Province ESU was not threatened in light of available conservation mea-

---

1. In May 1993, NMFS initiated a comprehensive status review of steelhead populations throughout the west coast to determine whether any populations should be listed as threatened or endangered. AR Ex. 451 at 27527. NMFS noted that there was a "general decline in many West Coast populations of steelhead." *Id.*

sures that were adequate to ameliorate the declining trend. Defendants' Opposition 8. NMFS did, however, list two of the five candidate ESUs—Lower Columbia River and California Central Valley. *Id.*

Plaintiffs brought this action under the Administrative Procedure Act, 5 U.S.C. § 706(2), challenging NMFS's Final Rule of 1998 as arbitrary and capricious.[2] Before the Court is plaintiffs' motion for summary judgment and defendants' cross-motion for summary judgment.

## LEGAL STANDARD

### A. Summary Judgment

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *See T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *See T.W. Electric,* 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Ting v. United States,* 927 F.2d 1504, 1509 (9th Cir.1991). The evidence presented by the parties must be admissible. Fed. R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49 (2d Cir.1985); *Thornhill Publ'g Co., Inc. v. GT & E Corp.,* 594 F.2d 730, 738 (9th Cir.1979). Hearsay statements found in affidavits are inadmissible. *See, e.g., Fong v. American Airlines, Inc.,* 626 F.2d 759, 762–63 (9th Cir.1980).

### B. Review of Administrative Action

#### 1. The Administrative Procedure Act Applies

This Court's review of NMFS's decision not to list the Klamath Mountains Province ESU is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). *Pyramid Lake Paiute Tribe v. U.S. Dep't of the Navy,* 898 F.2d 1410, 1413 (9th Cir.1990). The Court "shall" set aside any agency decision that the Court finds is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). The APA restricts the trial court reviewing an agency action from considering any evidence outside of the administrative record available to the agency at the time of the challenged decision. *See* 5 U.S.C. § 706(2)(E); *Florida Power & Light Co. v.*

**2.** Plaintiffs originally challenged defendants' March 19, 1998 non-listing decision as to both the Klamath Mountains Province ESU and the Northern California ESU as threatened. However, on February 4, 2000, NMFS issued a Proposed Rule to list the Northern California ESU as threatened, and sought a stay of this case pending action on the proposed new rule. The stay was granted, and

on May 31, 2000, defendants announced their decision to list the Northern California steelhead ESU. The new decision was timely brought to the Court's attention by defendants, and plaintiffs accordingly limited their challenge to defendants' decision not to list the Klamath Mountains Province steelhead ESU.

*Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); *Havasupai Tribe v. Robertson,* 943 F.2d 32, 34 (9th Cir.1991), *cert. denied,* 503 U.S. 959, 112 S.Ct. 1559, 118 L.Ed.2d 207 (1992).

The Court must determine whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Supreme Court has explained that an agency action would be arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency. . . ." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Although the arbitrary and capricious standard "is narrow and presumes the agency action is valid, . . . it does not shield agency action from a 'thorough, probing, in-depth review.'" *Northern Spotted Owl v. Hodel,* 716 F.Supp. 479, 481–82 (W.D.Wash.1988) (citations omitted). The Court cannot, however, substitute its judgment for that of the agency and should not determine whether it would have decided an issue differently. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

### 2. *Applicability of Motor Vehicles Mfrs. Ass'n v. State Farm Insurance Co.*

The parties dispute to what extent *Motor Vehicle Mfrs. Ass'n* is applicable to the present action. The Supreme Court in that case found arbitrary and capricious a decision by the National Highway Traffic Safety Administration to rescind an existing regulation requiring air bags and passive seat restraints in passenger automobiles. The Supreme Court held, "an agency changing its course by rescinding a rule is obligated to supply a reasoned

analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 41–42, 103 S.Ct. 2856. Plaintiffs argue that this language should be read to mean that an "agency's change of position can be taken as evidence of arbitrariness unless adequately explained, and that the agency has the burden of explaining the change." Plaintiffs' Reply and Opposition to Defendants' Cross–Motion 8.

Defendants, on the other hand, argue that *Motor Vehicle Mfrs. Ass'n* is not applicable because "[t]here was no previous rule in our case, merely a proposal." Defendants' Opposition 12. Defendants further argue that a change in position from a proposed rule is not the same as the rescission of an issued rule because "[a] paramount purpose of the APA is to make an agency publish its preliminary rule and then to *rethink* that position, in light of the comments and additional information received." *Id.* (emphasis in original).

In support of their position, plaintiffs cite *General Elec. Co. v. United States Dep't of Commerce,* 128 F.3d 767, 775 (D.C.Cir.1997), and *Oregon Natural Resources Council v. Daley,* 6 F.Supp.2d 1139, 1152 (D.Or.1998). *General Electric* involved a challenge to a final rule issued by the National Oceanic and Atmospheric Association ("NOAA")pursuant to the Oil Pollution Act of 1990, passed in response to the Exxon Valdez oil spill. 128 F.3d at 769. Applying the APA's arbitrary and capricious standard, the Court vacated one provision of the final rule for "lack of reasoned decision-making" because the NOAA failed to explain a change in position from the proposed rule to the final rule. The final rule gave trustees the power to "remove conditions that would prevent or limit the effectiveness of any restoration action (e.g., residual sources of contamination)." *Id.* at 774. The proposed rule had only directed the trustee to "consider" whether conditions exist that would impede the primary restoration ac-

tion of an oil spill. *Id.* at 775. The NOAA's lack of explanation for the change in position was fatal to the final rule because it created ambiguity over "the interrelationship between trustees' residual removal authority and the primary removal authority of the EPA and the Coast Guard," whereas the proposed rule did not. *Id.*

*General Electric* is distinguishable from this case because the change in position there involved an affirmative grant of authority that altered existing relationships between agencies who shared duties in a restoration action. It was thus critical that the agency explain how the new division of power operates. The present case does not involve an alteration of agency functions. The Court thus finds *General Electric* inapplicable to the present case.

*Oregon Natural Resources Council v. Daley* involved facts identical to the present matter. NMFS in that case issued a final rule not listing the Oregon Coast ESU of coho salmon as a threatened species after its proposed rule indicated that the ESU should be listed. 6 F.Supp.2d at 1152. The district court held, "Although it is certainly permissible for the NMFS to change its position after considering public comments and soliciting additional data, the issue is why it changed its position...." *Id.* Nothing in this statement indicates that NMFS has the burden or obligation to explain why it changed its position. The district court correctly held that the central question is why the NMFS changed its position after considering data and comments subsequent to the proposed rule.

■ To the extent that the NMFS provides an explanation, the Court can better understand the reasoning in changing its position. The explanation factors into the Court's determination as to whether the NMFS's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. This does not mean, however, that lack of an explanation

is "evidence of arbitrariness unless adequately · explained." Plaintiff's Reply 8. Accordingly, the Court holds that an agency does not have a burden to explain a change in position from a proposed rule to the final rule, and that lack of an explanation for the change is not in itself evidence of arbitrariness.

**DISCUSSION**

**A. The Endangered Species Act**

Congress enacted the ESA in 1973 out of deep concern for preservation of America's wildlife. The ESA aims "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of Such endangered species and threatened species." 16 U.S.C. § 1531(b); *see also Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The Supreme Court found that Congress intended "to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority,* 437 U.S. at 174, 98 S.Ct. 2279.

■ The ESA provides an array of statutory, protections to species listed as "endangered" or "threatened." If a species is listed under the ESA, the Secretary, must not merely avoid elimination of that species, but is required to bring the species back from the brink sufficiently to obviate the need for protected status. *Fund for Animals v. Babbitt,* 903 F.Supp. · 96, 104 (D.D.C.1995), *amended at* 967 F.Supp. 6. Thus, "listing is critically important because it sets in motion the Act's other provisions. including the protective regulation, consultation requirements, and recovery efforts." S.Rep. No. 418, 97th Cong., 2d Sess., 10 (1982). Section 4 of the ESA, 16 U.S.C. § 1533, prescribes the process for listing of a species under the ESA. The ESA defines an endangered species as one "in danger of extinction throughout all or a significant portion of its range," whereas a threatened species is "likely to become an

endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20).

### 1. The Listing Process

The Secretary of Commerce is charged with administering the listing process for the species at issue in this litigation. 16 U.S.C. § 1532(15). NMFS is the agency within the Department of Commerce that performs this duty. Defendants' Cross–Motion for Summ.J. 3 n. 3. Pursuant to § 1533(b)(3)(A), any interested party may petition NMFS to list a species as threatened or endangered. The section also requires, "[t]o the maximum extent practicable, within 90 days after receiving the petition," the listing agency must make a finding "as to whether the petition presents substantial scientific ... information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A).

If the agency deems the listing request may be warranted, it must then make a finding whether the listing is indeed warranted within 12 months of receiving the petition, after a status review. 16 U.S.C. § 1533(b)(3)(B). This determination must be published in the Federal Register along with a full and detailed proposed rule. 16 U.S.C. § 1533(b)(3)(B)(ii). Additionally, the listing agency must provide at least 60 days for all interested parties to comment on the proposed rule and provide relevant information. 16 U.S.C. § 1533(b)(5)(E). An ultimate decision to list the species with a final rule or withdraw the proposed rule must be made within one year from the date the agency publishes the proposed rule. 16 U.S.C. § 1533(b)(6)(A). If the agency finds that "there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the [listing] determination," it may invoke a six-month delay of the final decision to invite further public comment and information gathering. 16 U.S.C. § 1533(b)(6)(B)(I).

### 2. Substantive Guidelines for Listing

The ESA provides that the "Secretary shall ... determine whether any species is an endangered species or a threatened species because of any of the following factors":

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory, mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1)(A)–(E). These factors are listed in the disjunctive; any one or a combination can be sufficient for a finding that a particular species is endangered or threatened. *Carlton v. Babbitt,* 900 F.Supp. 526, 530 (D.D.C.1995). The Secretary is also required, in making final decisions on listing, to make determinations

> solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation ... to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices....

16 U.S.C. § 1533(b)(1)(A).

The parties dispute what types of "existing regulatory measures" and "efforts, if any, being made ... to protect such species" the Secretary may consider. 16 U.S.C. § 1533(b)(1). Plaintiffs argue that the Secretary, when considering state conservation efforts to protect the candidate species, "may not rely on plans for *future* actions." Plaintiffs' Motion for Summ.J. 26 (emphasis in original). Defendants argue that the Secretary "must consider all State conservation efforts, which includes

those that are not 'existing regulatory measures.' " Defendants' Opposition/Cross–Motion 18. Defendants correctly note that the Secretary must consider both existing regulatory measures and any other efforts being made by the State to preserve a candidate species, *id.* at 17–18, but argue further that an "effort being made" includes a conservation plan "which is in the process of being implemented ... although it may not be considered an 'existing regulatory mechanism.' " *Id.* at 18 n. 3.

Sections 1533(a)(1) and (b)(1) plainly do not allow the Secretary to consider a non-existent plan or speculate about future events, and neither party argues so. Rather, the heart of the dispute is whether the Secretary can consider an effort being made, existing regulatory measure, or even a Memorandum of Agreement as in this case, that includes components to be implemented in the future. Plaintiffs cite *Oregon Natural Resources Council v. Daley,* 6 F.Supp.2d 1139 (D.Or.1998), and defendants cite *Defenders of Wildlife v. Babbitt,* 97–CV–2330 TW (LSP) (S.D.Cal.1999), to support their opposing views.

■ *Oregon Natural Resources Council* presents facts nearly identical to the current case. In that case, NMFS had declined to list the Oregon Coast ESU of coho salmon after they determined in a proposed rule that the ESU should be listed as threatened. 6 F.Supp.2d at 1149. The change in position, like here, was based in part on a Memorandum of Agreement with the state and on a state enacted initiative plan. *Id.* at 1149–50. Both the Memorandum and the initiative plan included plans for future conservation actions. *Id.* at 1153. The court found that "with respect to future actions, the answer is straightforward"—reliance on future actions is not permitted by the ESA. *Id.* at 1153–54 (citing *Biodiversity Legal Found. v. Babbitt,* 943 F.Supp. 23 (D.D.C.1996); *Southwest Ctr. For Biological Diversity v. Babbitt,* 939 F.Supp. 49 (D.D.C.1996); *Friends of Wild Swan, Inc. v. U.S. Fish and Wildlife,* 945 F.Supp. 1388 (D.Or.

1996); and *Save Our Springs Legal Defense Fund, Inc. v. Babbitt,* 27 F.Supp.2d 739 (W.D.Tex.1997)). Upon review of those cases, this Court also agrees and hereby adopts the holding that the Secretary may not rely on future conservation actions for the reasons set forth below.

In enacting the ESA, Congress intended "to halt and reverse the trend toward species extinction, *whatever the cost.*" *Tennessee Valley Authority,* 437 U.S. at 184, 98 S.Ct. 2279. (emphasis added) The ESA cannot be administered on the basis of speculation or surmise. *See Bennett v. Spear,* 520 U.S. 154, 176, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The ESA recognizes that the task of conservation becomes more difficult and perhaps moot if restoration action is taken only when there is imminent threat of extinction. *Forest Conservation Council v. Rosboro Lumber Co.,* 50 F.3d 781, 785 (9th Cir.1995). Allowing private individuals to be involved in the listing process ensures that the Secretary will have early notification that any species is nearing endangerment. Reliance on future action is inconsistent with the aggressive preventive posture of the ESA because "[t]here are no assurances that the measures will be carried out, when they will be carried out, nor whether they will be effective in eliminating the threats to the species." *Save Our Springs Legal Defense Fund, Inc.,* 27 F.Supp.2d at 744.

Defendants cite *Defenders of Wildlife v. Babbitt,* 97–CV–2330 TW (LSP) (S.D.Cal.1999), which confirmed an agency decision not to list a particular lizard as threatened. The court there found that the decision not to list was properly based on three factors: (1) lack of conclusive data indicating the species' decline; (2) lessening significance of certain previously identified threats; and (3) a Conservation Agreement entered into by both state and federal agencies to protect the species on extensive tracts of public land. The court there rejected plaintiffs' contention that the third factor could not be considered, reasoning:

To require [Fish and Wildlife Service] to not consider state conservation strategies and agreements simply because the strategy is 'newly implemented' would discourage states from engaging in any conservation efforts at all.... The ESA was not to discourage states from taking measures to protect a species before it becomes technically or legally 'necessary' to list the species as threatened or endangered under ESA guidelines.

*Defenders of Wildlife v. Babbitt,* Slip Op. at 13 (Attach. to Declaration of Michael R. Sherwood in Supp. Of Plaintiffs' Motion for Summ.J.). The court also noted that the ESA does not "specify a length of time that a conservation plan must be in effect before [a listing agency] can rely upon it in reaching a listing determination." *Id.* at 12. The court emphasized that, in that case, the state plan was not the sole basis for the agency's decision not to list. *Id.* at 12 n. 5.

This Court finds the reasoning in *Oregon Natural Resource's Council* more persuasive. Prohibiting the Secretary from relying on future conservation actions by a State would not deter the State from engaging in its own preservation efforts. Nothing in the ESA requires a State to abandon any pending conservation plans once a species is listed. To the contrary, once a species is listed, the ESA authorizes the Secretary to enter into cooperative agreements with the State and allocate federal funding to effect these agreements "to assist in development of programs for the conservation of endangered and threatened species." 15 U.S.C. § 1535(c) and (d).

## B. NMFS Decision Not to List the Klamath Mountains Province ESU of Steelhead Was Arbitrary and Capricious

The Court begins with the reasons given by NMFS in the Final Decision not to list the Klamath Mountains Province ESU as threatened. NMFS explained, "In arriving at this determination, NMFS carefully considered the scientific conclusions of the BRT, existing and recently implemented State conservation efforts, and Federal management programs such as the NFP that have ameliorated risks to this species." AR Ex. 1 at 13366. Although the BRT conclusions would have warranted a finding that the steelhead were threatened, NMFS concluded that the other two factors—existing and recently implemented State efforts and federal management programs—sufficiently ameliorated the risks that listing was not warranted.

### 1. Scientific Conclusions of Biological Review Team ("BRT")

The BRT consists of sixteen experts working for NMFS to determine the status of west coast steelhead. Plaintiffs' Motion for Summ.J. 6. The BRT issues status reviews based on existing scientific data and reports. The reports are restricted to scientific conclusions regarding the risk of extinction under the assumption that present conditions will continue. AR Ex. 19 at 8–9. Because BRT did not consider any potentially ameliorative conservation measures, it was not in a position to recommend whether a species should be listed.[3] Defendants' Opposition 5.

The BRT produced three status reports concerning the Klamath Mountains Province ESU. The 1994 Status Report included review of 135 scientific studies and reports. AR Ex. 19 at 71–83. The 1996 Status Report included review of over 200 scientific studies, reports and other documents. AR Ex. 15 at 175–195. NMFS's finding that there was a scientific disagreement regarding the proposed listing prompted the 1997 Status Report. The BRT considered the scientific disagreement, reviewed new information submitted

---

**3.** The BRT acknowledged that "[c]onservation measures will be taken into account by the NMFS ... in making listing recommendations...." AR Ex. 15 at 5; *see also* AR Ex. 6 at 59 (BRT risk evaluations "are based only on past and present biological condition of the populations and do not contain a complete evaluation of the conservation measures as required under the ESA.").

after the 1996 status review, held hearings, and solicited comments from a number of peer reviewers and the public. AR Ex. 1 at 13348.

Throughout the listing process, BRT never varied from its conclusion that "if present trends continue," the Klamath Mountains Province ESU "are likely to become endangered in the foreseeable future." AR Ex. 19 at vi, 70 (December 1994 Status Review for Klamath Mountains Province Steelhead); AR Ex. 15 at vii, x, 168 (August 1996 Status Review of West Coast Steelhead from Washington, Idaho, Oregon, and California); AR Ex. 6 at iv, 29 (December 1997 Status Review Update for Deferred and Candidate ESUs of West Coast Steelhead). NMFS admits that these reports "represent[ ] the best scientific information presently available for the steelhead ESUs addressed in this final rule." AR Ex. 1 at 13349.

There is no dispute that the BRT status reports uniformly concluded that the Klamath Mountains Province ESU meets the standard to be considered as a threatened species—that the ESU was likely to become endangered in the foreseeable future if present trends continued. Defendants emphasize, however, that NMFS did not find the BRT's conclusions unequivocal. NMFS noted in the Final Rule that certain stocks within the Klamath Mountains Province ESU were "stable and increasing, such as winter-run steelhead in the Rogue River and summer-run steelhead in the Trinity, River." AR Ex. 1 at 13366. NMFS also recognized that a "minority [of the BRT] felt that this ESU was not presently at significant risk." AR Ex. 6 at 29 (1997 Status Report).

### 2. Existing and Recently Implemented State Conservation Efforts

In light of the BRT's findings, NMFS's ultimate decision not to list the ESU as threatened must have relied heavily on State conservation efforts being made or existing regulations which could adequately ameliorate the recognized threat to the ESU. Because the Klamath Mountains Province ESU reaches into both California

and Oregon, NMFS considered conservation efforts in both states. After review of those conservation efforts, NMFS found that they were sufficient to ameliorate the threat to the steelhead.

### a. California Conservation Efforts

In California, NMFS considered "recent harvest regulation changes, monitoring efforts implemented and committed to by California, and provisions in the NMFS/California Memorandum of Agreement ['California MOA']." Defendants' Opposition/Cross–Motion 24.

In February 1998, the California Department of Fish and Game ("CDFG") adopted a Strategic Plan for Management of Klamath Mountains Province Steelhead Trout ("Strategic Plan"). AR Ex. 239. The 16–page Strategic Plan presented reform of existing recreational angling and steelhead hatchery programs in California. AR Ex. 1 at 13363; Plaintiffs' Motion 33. California's emergency recreational angling regulations close fishing in steelhead tributaries, expand angling closures in the mainstream areas, and impose various restrictions on fishing bait and gear. AR Ex. 1 at 13366; Exs. 239 and 240. New hatchery management practices and policies aim to minimize wild and hatchery fish interactions, AR Ex. 1 at 13364; Ex. 243 at 4, to protect the genetic integrity of wild stock and prevent transmission of disease. AR Ex. 1 at 13360. The Strategic Plan also noted that the CDFG "commits to establishing a joint scientific and technical team ... to design appropriate detailed monitoring programs for steelhead." AR Ex. 1 at 13363.

California's commitment to developing monitoring efforts was "essential given the uncertain status of steelhead populations...." AR Ex. 1 at 13363. Realizing that "adequate State funding is critical to implementing this program," NMFS was satisfied with CDFG commitments to seek such funding for the new monitoring programs. AR Ex. 1 at 13363. Other than a budget change proposal, NMFS cited no

funding that had been definitively earmarked toward realizing CDFG's commitments.

Although NMFS determined that California's new angling and hatchery regulations could provide short-term benefits by improving population stability for steelhead, AR Ex. 1 at 13363; Exs. 239, 241, 242, NMFS acknowledged that habitat protection was more critical to sustained improvement of steelhead populations. AR Ex. 1 at 13364, 13367. The emergency fishing regulations do not seem to address the real problem causing steelhead decline. Even the CDFG noted to NMFS that it "believe[s] that sport angling has not been a cause of the declines experienced in California rivers and streams." AR Ex. 452 at 1. NMFS determined that the habitat protections begun by California would need to be functioning and achieving desired results within a short period of time for an upward trend to continue. AR Ex. 4 at 4–6. NMFS found in California that "[i]mpacts from agricultural and grazing practices have not historically been closely regulated ... [and] this was an important concern to NMFS because a substantial amount of area in the KMP ... is comprised of farmland." AR Ex. 1 at 13359. Destruction and modification of habitat is one of the primary causes for decline of steelhead in the Klamath Mountains Province ESU. Plaintiffs' Reply 2–3.

NMFS entered into the California MOA out of concern that "the State's habitat protection measures which are being evaluated ... are not presently adequate to secure properly functioning habitat conditions over the long-term." AR Ex. 1 at 13364. The California MOA was entered into on March 11, 1998, about a week before NMFS published its final decision, and consisted of a number of commitments toward conservation efforts. NMFS noted that the California legislature earmarked $43 million over six years for habitat restoration and watershed planning to benefit salmonids in coastal watersheds. AR Ex. 1 at 13362–13363; Ex. 75–A. The CDFG implemented a Watershed Initiative with $3 million to develop the Watershed Pro-

tection Restoration Council for fiscal year 1997–98. AR Ex. 1 at 13362. The CDFG further expressed intent to provide additional funds over the next five years. *Id.* The MOA also committed NMFS and the State to conduct an expedited review of the California Forest Practice Rules ("CFPR") and their implementation and enforcement. NMFS found that "although the [existing] CFPRs mandate protection of sensitive resources such as salmonid, the [existing] CFPR provisions and their implementation and enforcement, fall short of accomplishing this objective." AR Ex. 1 at 13358.

NMFS views the California MOA as "an important step in developing long-term conservation efforts." AR Ex. 1 at 13366. The California MOA consists primarily of proposals for future conservation action and was terminable at will by either NMFS or California. AR Ex. 1 at 13364; AR Ex. 243 at § 11:10. For example, with respect to the Watershed Protection and Restoration Council, NMFS noted that the Council "is still in progress and a Watershed Protection Program has yet to be developed." AR Ex. 1 at 13362. NMFS also recognized that the Watershed Initiative was nascent and offered "limited benefits to date for [Northern California] steelhead." AR Ex. 75 at 3.

**b. Oregon Conservation Plans**

In Oregon, NMFS relied on the Oregon Plan for Salmon and Watersheds ("OPSW") and an April 1997 MOA between NMFS and Oregon ("Oregon MOA"). The Oregon MOA contemplated collaboration between Oregon and NMFS to take specified actions with regard to steelhead. AR Ex. 238. The OPSW began in 1995 in an effort to recover coastal coho salmon. AR Ex. 1 at 13361. Oregon began work on the "Steelhead Supplement" to the OPSW in 1997 and completed it on March 11, 1998, about a week before NMFS issued its final decision not to list the Klamath Mountains Province ESU. AR Ex. 130 at 1 and 3. The Steelhead Supple-

ment committed Oregon to adapt implementation of the OPSW to effect restoration of steelhead. *Id.* NMFS found that "[r]ecently implemented measures contained in [the Steelhead Supplement of the OPSW] should improve habitat conditions for steelhead." AR Ex. 1 at 13366.

■ The Steelhead Supplement operates not like a regulatory scheme, but rather a like voluntary-based incentive program. *See* AR Ex. 236 at 1 (Steelhead Supplement relies on "teamwork" and "voluntary and cooperative actions.")[4] The Steelhead Supplement operates primarily through watershed council, which are voluntary. Plaintiffs' Motion 30. Indeed, most of the provisions in the Supplement are voluntary.

NMFS also submitted to the Oregon Board of Forestry recommendations for improvements in forest practice rules. AR Ex 236 at 15E–3 and 15E–10. These recommendations were submitted in light of NMFS's opinion that the current forest practice rules do not adequately protect salmonid. AR Ex. 1 at 13358. Additionally, NMFS considered emergency angling restrictions in Oregon, much like the restrictions in California. The emergency restrictions were issued in February 1998, one month before the NMFS decision not to list, and thus should be deemed to be a plan with a future effect. Moreover, as discussed with the California emergency restrictions, curbing steelhead fishing does not address the primary cause of steelhead decline, which involves habitat. *See* AR Ex. 236 at 4–11 (Oregon Department of Fish and Wildlife stated "[h]istorically, excessive harvest is not thought to have been a significant factor in the decline of many populations of Oregon steelhead.").

**c. Relying On Existing and Recently Implemented State Conservation Efforts Was Arbitrary and Capricious**

■ The Court concludes that NMFS acted arbitrarily and capriciously in relying on existing and recently implemented conservation efforts in California and Oregon. Since NMFS issued the proposed rule listing the Klamath Mountains Province ESU as threatened on August 9, 1996, its change in position and decision not to list the steelhead must be based on newly discovered or newly implemented conservation efforts after August 1996.

All the conservation actions cited by NMFS in its 1998 Final Rule were discussed above. The Court finds that most of the plans were in fact proposals for future action. NMFS could not rely on future actions in making its determination. The remaining plans involved voluntary measures toward conservation. Although it was appropriate for NMFS to consider such measures, it was arbitrary and capricious for NMFS to rely, in effect, exclusively on voluntary, actions despite its finding in the Proposed Rule that past state conservation efforts were inadequate. To find voluntary and future actions sufficient to ameliorate the threat to the Klamath Mountains Province ESU was arbitrary and capricious.

**3. Federal Regulatory Schemes—The Northwest Forest Plan ("NFP")**

NMFS last relies on the protections afforded by federal regulatory schemes. It cites the NFP and new habitat protections enacted after listing of the Southern Oregon/Northern California coho salmon as adequate measures to protect the Klamath Mountains Province ESU. AR Ex. 1 at

4. Plaintiffs argue that it was inappropriate for NMFS to even consider plans that are voluntary, as the court in *Oregon Natural Resources Council* held. 6 F.Supp.2d at 1154 ("Voluntary actions, like those planned in the future, are necessarily speculative."). This Court declines to adopt that holding. Although voluntary actions are not certain in the same way that regulatory schemes are, they are nonetheless concrete proposals. It is appropriate that NMFS consider voluntary actions to the extent that they are an "effort being made" to protect a threatened species. However, excessive reliance on primarily voluntary plans may be arbitrary and capricious.

**1170**

13355. These are existing regulatory mechanisms that NMFS may properly consider. *Oregon Natural Resources Council,* 6 F.Supp.2d at 1155. NMFS stated

> the overall effectiveness of the NFP in conserving steelhead is limited by the extent of Federal lands and the fact that Federal land ownership is not uniformly distributed in watersheds within the effected ESUs.

AR Ex. 1 at 13355. Sixty-four percent of the Klamath Mountains Province ESU is located within NFP boundaries. AR Ex. 1 at 13366.

In making its Proposed Rule in 1996 to list the Klamath Mountains Province ESU, NMFS considered any potential ameliorative effects of NFP and concluded then that the NFP was not adequate in restoring steelhead. AR Ex. 13 at 41556, 41558. Defendants argue, however, the situation had changed by the time of the 1998 Final Rule. The 1996 Proposed Rule considered the NFP inadequate with respect to five different ESUs, including the Klamath Mountains Province ESU. Defendants' Reply 8. Some of the other ESUs covered less federal/NFP territory than the Klamath Mountains Province ESU does. *Id.* Thus it is not inconsistent that NMFS found NFP inadequate when considering all five ESUs in 1996 but adequate as to the Klamath Mountains Province ESU specifically in 1998. *Id.*

The Court finds defendants' explanation persuasive. The Court will not substitute its judgment for that of NMFS with regard to its conclusions about the adequacy of NFP. *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. However, the effectiveness of the NFP is limited. Although the NFP covered 64% of the Klamath Mountains Province ESU, NMFS still noted in the Final Rule a concern about NFP's effectiveness because "Federal land ownership is not uniformly distributed." AR Ex. 1 at 13355. NMFS was still concerned that the NFP by itself may not be adequate, even as applied to the Klamath Mountains Province ESU. With

regard to habitat protections enacted subsequent to the coho salmon listing, NMFS gave no specific explanation as to how those regulatory, measures protect steelhead. NMFS still relied in large part on numerous other state conservation actions to conclude that the Klamath Mountains Province ESU was not threatened. The Court has found these other state conservation actions to be inadequate, as discussed above.

Thus, though it was rational for NMFS to rely on the NFP and other federal regulatory measures, NMFS's Final Rule was nonetheless arbitrary and capricious in light of the Court's findings on the inadequacy of other conservation measures. The federal regulatory measures alone cannot save NMFS's Final Rule.

## CONCLUSION

The NMFS's ultimate conclusion that current and newly implemented State and federal conservation efforts were adequate to ameliorate the serious risks of endangerment to steelhead in the Klamath Mountains Province ESU was not supported by the administrative record. For this and the foregoing reasons, the Court finds NMFS's decision not to list the Klamath Mountains Province ESU was arbitrary and capricious, and therefore GRANTS plaintiffs' motion for summary judgment and DENIES defendants' cross-motion for summary judgment. The March 19, 1998 Final Rule declining to list the Klamath Mountains Province ESU is set aside, and this matter is remanded to the NMFS for further consideration and decision consistent with this Order, to be completed on or before *March 31, 2001.*

**IT IS SO ORDERED.**