GREATER YELLOWSTONE
COALITION, INC.,
Plaintiff,

v.

Christopher SERVHEEN, U.S. Fish and
Wildlife Service Grizzly Bear Recovery Coordinator; H. Dale Hall, U.S.
Fish and Wildlife Service Director;
Dirk Kempthorne, Secretary of the Interior; and United States Fish and
Wildlife Service, Defendants.

and

National Wildlife Federation, Idaho
Wildlife Federation, Montana Wildlife
Federation, Wyoming Wildlife Federation, State of Wyoming, Safari Club
International, and Safari Club International Foundation, State of Montana, Montana Department of Fish,
Wildlife, and Parks, Defendant–Intervenors.

No. CV 07–134–DWM.

United States District Court,
D. Montana,
Missoula Division.

Sept. 21, 2009.

Douglas L. Honnold, EarthJustice Legal Defense Fund, Bozeman, MT, Jack R. Tuholske, Tuholske Law Office, Missoula, MT, for Plaintiff/Intervenor Defendant.

Thomas M. France, National Wildlife Federation, Missoula, MT, Mike McGrath, Office of the Montana Attorney General, Robert N. Lane, William A. Schenk, Helena, MT, for Intervenor Defendant.

Robert H. Aland, Winnetka, IL, pro se.

Coby Howell, Office of the U.S. Attorney, Portland, OR, Rickey Doyle Turner, Jr., U.S. Department of Justice, Washington, DC, Victoria L. Francis, Office of the U.S. Attorney, Billings, MT, for Defendant.

## ORDER

DONALD W. MALLOY, District Judge.

## I. Introduction

In this case, Greater Yellowstone Coalition ("GYC") seeks judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq. The Complaint alleges the Defendants violated the ESA when the United States Fish and Wildlife Service ("Service") designated a Distinct Population Segment ("DPS") for the Greater Yellowstone Area grizzly bear population and removed the population from the threatened species list under the ESA.

Plaintiff claims the delisting decision violates the ESA on four grounds: (1) there are inadequate regulatory mechanisms to protect the grizzly bear once it is delisted; (2) the Service did not adequately consider the impacts of global warming and other factors on whitebark pine nuts, a grizzly food source; (3) the population is unacceptably small and dependent on translocation of outside animals for genetic diversity; and (4) the Service did not properly consider whether the grizzlies are recovered across a significant portion of their range. Before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, I am vacating the delisting of the Yellowstone Grizzly and remanding the matter to the agency for further consideration.

## II. Factual Background

### A. *Characteristics and history of the grizzly bear*

The grizzly bear is a member of the brown bear species found across North America, Europe, and Asia. Adult grizzly bears are generally solitary, but maintain home ranges that overlap; overlapping ranges contribute to the genetic diversity of a population. AR 11276.[1] Female grizzly bears begin reproducing between the ages of three and eight years, and litter size ranges from one to four cubs. Cubs remain with their mothers for two to three years before the mother reproduces again. Grizzly bears have "one of the slowest rates among terrestrial mammals, resulting primarily from the late age of first reproduction, small average litter size, and the long interval between litters.... [I]t may take a single female 10 years to replace herself in a population." *Id.*

---

1. Citations to the Administrative Record (AR xxxxx) refer to the Bates-stamped numbering in the lower right-hand corner of each page.

Grizzly bears are opportunistic omnivores that consume a variety of foods depending on what is available. Grizzlies in the Greater Yellowstone Area rely primarily on four food sources: ungulate meat, whitebark pine seeds, cutthroat trout, and army cutworm moths. *Id.* The availability of whitebark pine seeds varies from year to year, and grizzly bears must eat other foods when the seeds are not available. AR 11276–77. Whether grizzly bears in the Yellowstone area have access to whitebark pine seeds has an effect on fecundity and survival rates. AR 11336.

Prior to European settlement, grizzly bears were widely distributed throughout the western part of North America and their population numbered approximately 50,000. AR 11274. After European settlement, grizzly bear numbers declined sharply, caused in part by active government efforts to eradicate the animal. By 1950, grizzlies were extirpated from 98%–99% of their previous range and were confined to a few remnant areas in the Northern Rockies, including Yellowstone National Park. AR 11277. The Yellowstone grizzly population suffered additional mortalities when the Park closed its garbage dumps in the 1970s. *Id.*

The grizzly population in and around Yellowstone Park is isolated from all other populations of grizzly bears and has been isolated for approximately 100 years. AR 11287. The Greater Yellowstone Area grizzly bears are more genetically isolated and homogeneous than any other grizzly bear population, except for grizzlies on Kodiak Island in Alaska. *Id.* The Service states that there are "substantial" barriers to establishing connectivity with other grizzly bear populations. AR 03007. Over time a genetically isolated population can suffer declines in genetic diversity that can make the population vulnerable. AR 11335.

## B. *ESA listing and recovery efforts*

In 1975, the grizzly bear was designated a threatened species in the lower 48 states under the ESA. 40 Fed.Reg. 31734, 31735 (Jul. 28, 1975), AR 10716. At the time, there were only an estimated 1000 grizzly bears remaining in the lower 48 states, including an estimated 136–312 bears in the Greater Yellowstone Area. AR 11278. The Service concluded that several factors justified listing the grizzly bears as threatened, including the curtailment of their range to a few isolated regions, high mortality due to human-bear conflicts, and genetic isolation of populations from one another. 40 Fed.Reg. at 31734, AR 10715.

In 1982, the Service completed the first Grizzly Bear Recovery Plan. The Recovery Plan identified several Recovery Zones for grizzly bears, including the Yellowstone Grizzly Bear Recovery Zone. AR 11278. In 1993, the Service revised the Recovery Plan. A federal district court found the Recovery Plan did not comply with the ESA. *Fund for Animals v. Babbitt,* 903 F.Supp. 96 (D.D.C.1995). The parties subsequently reached a settlement that established requirements in the Recovery Plan that the Service needed to meet for the grizzly bear to be removed from the threatened list under the ESA. AR 11278–79.

## C. *Delisting decision and the Conservation Strategy*

The Yellowstone grizzly bear population increased at a rate between 4.2% and 7.6% per year from 1983 until 2002. AR 11280. By 2007, the population in the Greater Yellowstone Area measured approximately 500. AR 11278. Grizzly bears are likely approaching their carrying capacity inside Yellowstone National Park. AR 11280.

In November 2005, the Service proposed designating the Greater Yellowstone Area population of grizzly bears as a Distinct Population Segment (DPS) and removing

it from the list of threatened and endangered species. AR 11138. The DPS includes portions of Idaho, Montana and Wyoming, including Yellowstone National Park. AR 11284–85. The Service estimates that grizzly bears currently occupy 68% of the suitable habitat[2] within the DPS. AR 11283.

Within the DPS, the Service separates the land into two zones. First, the Primary Conservation Area, which corresponds to the Yellowstone Recovery Zone in the 1993 Recovery Plan, is the core area of habitat for the DPS. The Primary Conservation Area includes Yellowstone National Park and adjacent areas, 98% of which is managed by the National Park Service or the United States Forest Service. The Service estimates that the Primary Conservation Area contains 51% of the suitable habitat for grizzly bears within the DPS boundaries and contains 84–90% of the population of female grizzlies with cubs in the DPS boundaries. According to the Service, land within the Primary Conservation Area will be managed primarily to maintain grizzly bear habitat. AR 11283.

The DPS also includes land outside the Primary Conservation Area. This land includes a mixture of federal, state, tribal and private lands, and it is to be managed in accordance with the Conservation Strategy, discussed below. The Service plans for grizzly bears to expand into suitable habitat outside the Primary Conservation Area in accordance with the Conservation Strategy and state management plans. These lands will be managed to maintain existing resource and recreational uses, in addition to allowing grizzly bears to occupy areas of suitable habitat. AR 11283.

As directed in the 1993 Recovery Plan, the Service coordinated with other federal agencies and state agencies in Idaho, Montana, and Wyoming to develop the Conservation Strategy. AR 02982–84. The Conservation Strategy controls management of the grizzly bear within the Primary Conservation Area and sets forth standards for monitoring the DPS population. AR 11332. All of the parties to the Conservation Strategy have signed a Memorandum of Understanding indicating that they are committed to maintaining and enhancing the delisted grizzly bear DPS. AR 02982. As part of the Conservation Strategy, Idaho, Montana and Wyoming have each developed a management plan which will guide management outside the Primary Conservation Area. AR 11333.

In the delisting proposal, the Service noted that the Yellowstone population is still isolated from other grizzly bear populations and at risk over the next several decades of losing additional genetic diversity. To combat this issue, the Service proposed that, if no connectivity with other populations occurs by 2020, one to two effective migrant grizzlies per generation will be transferred into the Yellowstone grizzly population. AR 11335–36.

On March 29, 2007, the Service issued the Final Rule designating the Greater Yellowstone Area grizzly bear Distinct Population Segment and delisting the DPS population. 72 Fed.Reg. 14866 (Mar. 29, 2007).

### III. Standards of Review

#### A. *Summary Judgment Standard*

■ Summary judgment is proper if "the pleadings, depositions, answers to in-

---

**2.** The Service defines "suitable habitat" as "area within the DPS boundaries capable of supporting a viable grizzly bear population now or within the foreseeable future." AR 11321. Suitable habitat meets three criteria:

(1) adequate to support grizzly bear reproduction and survival; (2) contiguous within current distribution of grizzly bears so as to permit re-colonization; and (3) posing low mortality risks for grizzly bears. *Id.*

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is a particularly appropriate tool for resolving claims challenging agency action. *See Occidental Eng'g Co. v. INS,* 753 F.2d 766, 770 (9th Cir.1985). Summary judgment is appropriate in this case because the issues presented address the legality of Defendants' actions based on the administrative record and do not require resolution of factual disputes.

B. *Standard of APA Review*

▉▉▉ Judicial review of an agency's compliance with the ESA is governed by the judicial review provisions of the APA. *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 891 (9th Cir.2002). Agency decisions can only be set aside under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706(2)(A)), overruled on other grounds, *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Review under the arbitrary and capricious standard is "narrow," but "searching and careful." *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Agency action can be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d

443 (1983). The court must ask "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... [The court] also must determine whether the [agency] articulated a rational connection between the facts found and the choice made. [The] review must not rubber-stamp ... administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Engrs.,* 361 F.3d 1108, 1119 (9th Cir.2004) (internal citations and quotations omitted). Nevertheless, a court may not substitute its judgment for that of the agency or merely determine it would have decided an issue differently. *Or. Natural Res. Council v. Allen,* 476 F.3d 1031, 1035 (9th Cir.2007).

## IV. Analysis

A. *ESA standards*

The purpose of the ESA is to conserve the ecosystems upon which endangered and threatened species depend and to provide a program for the conservation of such species. 16 U.S.C. § 1531(b). ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures [of the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

Species that are in danger of extinction must be listed as endangered or threatened after public notice and comment. 16 U.S.C. § 1533. An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout

all or a significant portion of its range." 16 U.S.C. § 1532(20).

To determine if a species should be listed as threatened or endangered, agencies must consider five factors; the same factors apply to determine if a previously listed species should be delisted. 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(d). The factors include:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c). Agencies must make decisions about listing or delisting a species "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(d). "A species may be delisted only if [the best available] data substantiate that it is neither endangered nor threatened," because it is extinct, recovered, or the original data for classification were in error. 50 C.F.R. § 424.11. A species reaches "recovery" when there is "improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in [16 U.S.C. § 1533(a)(1) ]." 50 C.F.R. § 402.02.

The ESA defines "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). The Service, along with the National Marine Fisheries Service has identified three elements to evaluate in identifying and classifying a "distinct population segment." 61 Fed.Reg. 4722 (Feb. 7, 1996). The elements include: (1) discreteness of the population segment in relation to the remainder of the species to which it belongs; (2) the significance of the population segment to the species to which it belongs; and (3) the population segment's conservation status in relation to the Act's standards for listing. 61 Fed. Reg. at 4725. Based on these criteria, the Service designated the Yellowstone grizzly bears as a DPS. The Plaintiff does not challenge the DPS designation.

## B. *Adequacy of regulatory mechanisms*

Plaintiff first contends "the inadequacy of existing regulatory mechanisms" demonstrates that the Yellowstone grizzly bear DPS should not be removed from the threatened species list. 16 U.S.C. § 1533(a)(1)(D). Plaintiff asserts numerous specific inadequacies in the regulatory mechanisms, but the underlying theme among all of the alleged inadequacies is that the Conservation Strategy, which is central in the Service's analysis of regulatory mechanisms, is unenforceable and non-binding on state and federal agencies.[3]

The same factors, including "the inadequacy of existing regulatory mechanisms," apply in both listing and delisting determinations. 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(d). When considering the inadequacy of existing regulatory mechanisms in the context of a petition to list a species, the question is whether the existing regulatory mechanisms are inadequate to prevent a species that is presumably decreasing in population from becoming threatened, endangered, or even extinct.

---

3. While the Plaintiff raises a number of particular criticisms of the regulatory mechanisms, the Court does not address all of them in detail, given the Court's conclusion that the Service erred in its consideration of the Conservation Strategy, state plans, and Forest Plan amendments in assessing the existing regulatory mechanisms.

However, a petition to delist a species presents a different factual scenario. The ESA is designed to restore species "to the point at which the measures [of the ESA] are no longer necessary." 16 U.S.C. § 1532(3). When assessing the adequacy of regulatory mechanisms in regards to a plan to delist a species, the agency must assess whether regulatory mechanisms are adequate to maintain a delisted species such that "the measures [of the ESA] are no longer necessary." 16 U.S.C. § 1532(3). That is, in the context of a petition to remove a species from the threatened or endangered list, the question is whether the existing regulatory mechanisms, without the protections of the ESA, are adequate to maintain a population at a recovered level sufficient to prevent the need for future relisting.

The ESA does not define what constitutes an "existing regulatory mechanism." 16 U.S.C. § 1533(a)(1) Courts addressing what regulatory mechanisms should be considered under section 1533 have concluded that the ESA does not permit agencies to rely on plans for future action or on unenforceable efforts. *E.g. Or. Natural Resources Council v. Daley,* 6 F.Supp.2d 1139, 1155 (D.Or.1998). As the Court noted in *Or. Natural Resources Council,* "for the same reason that the Secretary may not rely on future actions, he should not be able to rely on unenforceable efforts. Absent some method of enforcing compliance, protection of a species can never be assured. Voluntary actions, like those planned in the future, are necessarily speculative." *Id.* at 1154. *See also Fedn. of Fly Fishers v. Daley,* 131 F.Supp.2d 1158, 1165, 1169 (N.D.Cal.2000) (concluding that a Memorandum of Understanding with states to undertake future conservation efforts did not constitute an existing regulatory mechanism).

Similarly, one court has held that it was a violation of the APA and ESA for the agency to rely on a Conservation Agreement with state agencies that had not yet been implemented and had no proven track record of success, where the Secretary had to assume the provisions would be put into effect. *Save Our Springs v. Babbitt,* 27 F.Supp.2d 739, 748 (W.D.Tex. 1997). In *Save Our Springs,* the Court also found that the Conservation Agreement would not be protective because it only required steps such as "evaluating" and "identifying" threats and implementing monitoring, with no tangible requirements for improving habitat or reducing threats to the species. *Id.* at 744.

 The United States Supreme Court has said that a land use management plan providing that the BLM "will monitor" is "not a legally binding commitment enforceable under [the APA]." *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 72, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). Likewise, monitoring requirements set forth in a Forest Plan are not enforceable or subject to judicial review under the APA because monitoring does not constitute a final agency action. *Ecology Center, Inc. v. U.S. Forest Service,* 192 F.3d 922, 925 (9th Cir.1999). Monitoring requirements are not enforceable until there is a site-specific plan. *Native Ecosystems Council v. U.S. Forest Service,* 418 F.3d 953, 961 (9th Cir.2005). When Forest Plans contain standards, the standards are "mandatory requirements," in contrast to guidelines, "which are discretionary." *Miller v. U.S.,* 163 F.3d 591, 594, n. 1 (9th Cir.1998).

In the portion of the Final Rule addressing the existing regulatory mechanisms, the Service discusses the following: various federal and state statutes and regulations, the Conservation Strategy, Forest Plans amendments incorporating the Conservation Strategy, and state management plans. AR 11331–35.

### 1. *Other federal and state laws*

The Service argues that it analyzed 73 rules and regulations to assure that there are adequate regulatory mechanisms. However, the Final Rule includes only a brief mention of these with a conclusory statement that they will be adequate to protect the grizzly bear population. AR 11331–32. It does not include any analysis of how or why these various laws will be adequate to protect a recovered population. The Conservation Strategy also mentions these various state and federal laws, but it too neglects to analyze how these laws would or would not be adequate regulatory mechanisms. It merely enumerates the laws with a brief description of their contents and then lists them in a chart. AR 03038–48; 03133–36. Such superficial assessment in the Final Rule and the Conservation Strategy is insufficient under the APA. Because the documents contain no analysis of how the laws listed by the Service will affect the grizzly bear population, the Court cannot determine "whether the [agency] articulated a rational connection between the facts found and the choice made." *Ocean Advocates*, 361 F.3d at 1119 (internal citations and quotations omitted).

### 2. *The Conservation Strategy*

The Final Rule analyzes the Conservation Strategy as "the plan which will guide management and monitoring of the Yellowstone grizzly bear population and its habitat after delisting." AR 11332. The Service contends that the two "keys" of the Conservation Strategy are (1) population/mortality standards and monitoring and (2) habitat standards and monitoring. Govt. Resp. at 6. Chapter 2 of the Conservation Strategy discusses population/mortality standards and monitoring. The only "standard" set forth in Chapter 2 is a goal of maintaining above 500 bears and associated mortality limits for grizzly bears. There are no additional standards

that delineate how to maintain a population level of 500 bears or how to ensure that mortality does not exceed the specified levels. AR 02977; 02996–97. The only other aspects of the population/mortality section of the Conservation Strategy set forth protocols for monitoring the grizzly bear population. AR 02977; 02998–03007. However, there is no way to enforce the monitoring protocols set forth in the Conservation Strategy. *Norton*, 542 U.S. at 72, 124 S.Ct. 2373. In addition, even if the monitoring were enforceable, the monitoring itself does nothing to protect the grizzly bear population. Without tangible requirements specifying how the population will be maintained at 500 bears and how the mortality limits will be enforced, there is nothing in this portion of the Conservation Strategy that actually serves as a regulatory mechanism to maintain the grizzly bear population. *See Save Our Springs*, 27 F.Supp.2d at 744.

The second purported "key" of the Conservation Strategy, habitat standards and monitoring, likewise fails to set forth adequate enforceable criteria. The Conservation Strategy establishes habitat standards inside the Primary Conservation Area for permissible changes to secure habitat, the number and capacity of developed sites, and livestock allotments. AR 03009–13. However, it does not contain analogous standards for lands outside the Primary Conservation Area; instead, it states that "agencies will cooperate with the appropriate state wildlife agency in development of additional *future*, area-specific grizzly bear management goals." AR 03009 (emphasis added) Like the population monitoring protocols, the Conservation Strategy also lays out monitoring protocols for habitat both inside and outside the Primary Conservation Area. AR 03013–26. These monitoring requirements

are unenforceable and do not protect the grizzly bear population. *Norton,* 542 U.S. at 72, 124 S.Ct. 2373. Outside the Primary Conservation Area, there are no standards to serve as regulatory mechanisms for the protection of the recovered grizzly bear population; instead, there is only a promise of future, unenforceable actions. Promises of future, speculative action are not existing regulatory mechanisms. *Or. Natural Resources Council,* 6 F.Supp.2d at 1155; *Fedn. of Fly Fishers,* 131 F.Supp.2d at 1165, 1169.

▬ Additionally, the Conservation Strategy discusses how the Service will respond if there are deviations from any of the mortality or habitat standards: there will be a Biology and Monitoring Review by a committee of agency representatives. The purposes of a Review are, among other things, to identify why targets have not been met, make recommendations for changes, and consider possible changes in management. AR 03036. The Review may also recommend that a petition for relisting be submitted. AR 03036–37. These provisions do not serve as regulatory mechanisms because they offer only a plan or promises of future actions. *Or. Natural Resources Council v. Daley,* 6 F.Supp.2d at 1155. The Service and other agencies are not required to take any concrete response to protect grizzlies if monitoring shows population or habitat declines, but only to "identify" the problems and make recommendations for changes.

▬ Even if the Conservation Strategy contained sufficient standards, the Service has not shown that the state and federal agencies which are signatories to the agreement can be compelled to comply with the Conservation Strategy. The Conservation Strategy states that the various agencies are "committed to" the Conservation Strategy. AR 02976. However, the comments and responses in the Final Rule reveal that the Service cannot compel any

of the agencies to live up to their commitments:

> We [the Service] have no authority to compel the States to enact laws, nor do we believe it is necessary. . . . While *the Strategy cannot legally compel any of the signatories to implement management policies* or obligate funding, the various Federal agencies and State governments' signatures on the Strategy clearly indicate their intention to manage grizzly bears according to the Strategy.

AR 11313 (emphasis added). Thus, the Service admits that the Conservation Strategy, the centerpiece of the regulatory mechanisms relied on by the Service, cannot actually regulate anything. An "intention" or "commitment" to manage grizzly bears a certain way is not a regulatory mechanism. Because the Service admits that the Conservation Strategy is unenforceable, the Strategy was not properly considered in the Service's evaluation of existing regulatory mechanisms. *Or. Natural Resources Council v. Daley,* 6 F.Supp.2d at 1154–55.

### 3. *Forest Plan amendments*

The Final Rule discusses at length the amendments to Forest Plans for United States Forest Service land within the DPS boundaries. AR 11332–33. The National Forest Management Act ("NFMA") requires the Forest Service to develop forest plans to guide actions on the forests. 16 U.S.C. § 1604(a). As part of the development of the Conservation Strategy and the Final Rule, the Forest Service revised its Forest Plans on national forests within the DPS. AR 11332. The amendments incorporate the habitat standards from the Conservation Strategy to guide management of grizzly bears on Forest Service lands within the DPS. *Id.*

Plaintiff focuses on whether the Forest Plan amendments are adequate given new regulations promulgated in 2005 that no longer include standards in Forest Plans. However, the Forest Plan amendments are inadequate regulatory mechanisms for the same reasons the Conservation Strategy is inadequate.

The Record of Decision (ROD) for the Forest Plan amendments contains few standards, and those standards only apply inside the Primary Conservation Area. AR 32406. Outside the Primary Conservation Area, there is no enforceable standard in the ROD; instead, there are "guidelines" for managing grizzly bears. AR 32406–07. Whether the 2005 regulations apply or not, these "guidelines" are discretionary and thus legally unenforceable. *Miller*, 163 F.3d at 594, n. 1. The ROD also contains monitoring protocols. AR 32407. Like the guidelines, the monitoring requirements in the Forest Plan are not a final agency decision so they are legally unenforceable. *Ecology Center, Inc.*, 192 F.3d at 925. Because the Forest Plan amendments contain no enforceable standards outside the Primary Conservation Area, they do not serve as an adequate mechanism for grizzly bear management.

4. *State management plans*

The Final Rule also asserts that the state management plans for Idaho, Montana and Wyoming, developed in concert with the Conservation Strategy, are existing regulatory mechanisms that will guide grizzly bear management outside the Primary Conservation Area. AR 11332–33. The state plans suffer from the same flaws as the Conservation Strategy: they are premised on monitoring and future actions, and they contain few, if any, enforceable standards. For example, the Wyoming plan contains only "general management guidelines" for habitat and managing nuisance bears, which cannot legally be enforced because guidelines are discretionary. AR 03294–95; *Miller*, 163 F.3d at 594, n. 1. The Montana and Idaho plans have similar "goals" and "guidelines" for management. *E.g.* AR 03332, 03342; 03175–76; 03192. While the state plans incorporate the mortality limits in the Conservation Strategy, the plans include no enforcement mechanism or standards to ensure that mortality does, in fact, stay below the prescribed levels. Nor are the states required to take any specific management response if mortality exceeds the limits in the Conservation Strategy.

Like the Conservation Strategy, the state plans also contain monitoring protocols. *E.g.* AR 03334–37; 03177. In addition, the state plans rely on future development of monitoring plans. *E.g.* AR 03287–89;03177; 03336. As stated above, the Service cannot rely on unenforceable or future actions when assessing whether existing regulatory mechanisms are adequate. *Fedn. of Fly Fishers*, 131 F.Supp.2d at 1165, 1169. The Service incorrectly relied on state plans not yet in place on the assumption the states will implement them and develop further monitoring and regulation. *Save Our Springs*, 27 F.Supp.2d at 748.

The state plans reveal that the states do not have the authority to fulfill their goal of regulating management outside the Primary Conservation Area. As the Service points out, much of the land outside the Primary Conservation Area is federally owned and is not subject to state control. AR 11333. The state plans recognize that the states have limited ability to manage grizzly bears outside the Primary Conservation Area. For example, Montana's plan recommends monitoring and "consulting with land management agencies on issues related to grizzly bear habitat protection, disturbance, and mitigation." AR 03172–73. The Idaho plan addresses this issue

more directly, stating that Idaho "has no jurisdiction over the land management activities on a majority of the land adjacent to the [Primary Conservation Area]." AR 03333. Instead, Idaho will act in an "advisory" capacity and "work with" other agencies. AR 03333–34. Because the state plans are not enforceable in much of the area they are intended to manage, they do not serve as adequate regulatory mechanisms, and the Service erred in relying on them. *Or. Natural Resources Council*, 6 F.Supp.2d at 1154–55; *Fedn. of Fly Fishers v. Daley*, 131 F.Supp.2d at 1165.

The majority of the regulatory mechanisms relied upon by the Service—the Conservation Strategy, Forest Plan amendments, and state plans—depend on guidelines, monitoring, and promises, or good intentions for future action. Such provisions are not adequate regulatory mechanisms when there is no way to enforce them or to ensure that they will occur. Furthermore, the Service does not explain how various other laws and regulations will protect the grizzly bear population. The Service did not comply with the ESA in its consideration of the adequacy of existing regulatory mechanisms for purposes of delisting.

## C. *Effects of whitebark pine declines*

Plaintiff next asserts the Service did not adequately consider the impacts on whitebark pine from global warming and other causes. Plaintiff argues the best available science shows that whitebark pine nuts are an important source of food for grizzlies in the Greater Yellowstone Area, and a large decline in whitebark pine will negatively impact the grizzly population. The Service disagrees, claiming the best available science shows that grizzly bears will adjust to any declines in whitebark pines.

The Service reviewed numerous studies that analyze threats to whitebark pine as a "natural or manmade fac-

tors affecting [grizzly bears'] continued existence." 16 U.S.C. § 1533(a)(1)(E). The ESA requires the agency to rely on the best available science in making its decision. 16 U.S.C. § 1533(b)(1)(A). When an agency decision involves a high level of technical and scientific expertise, a Court will defer to the agency's conclusions, so long as they are reasonable. *Lands Council v. McNair*, 537 F.3d 981, 983 (9th Cir.2008). The agency must consider all the relevant factors and articulate a relationship between those factors and the conclusions it reaches. *Ocean Advocates*, 361 F.3d at 1119.

Both the Plaintiff and the Service agree that whitebark pine is an "important fall food source" for grizzly bears in the Greater Yellowstone Area, and grizzly bears consume it extensively when it is available. AR 11277. However, whitebark pine nut availability fluctuates from year to year. AR 26104–14. Studies show a relationship between the availability of whitebark pine nuts and grizzly bear survival and fecundity rates. AR 22065–74; AR 28733–51. The Final Rule recognizes that grizzly bear conflicts with humans increase, thus increasing grizzly bear mortality, in years when whitebark pine nuts are not widely available. AR 11277.

The identifiable best available science indicates that whitebark pines are expected to decline due to a variety of causes, including climate change, increased forest fires, the mountain pine beetle epidemic, and infection by white pine blister rust. AR 11336–38. Whitebark pine has already suffered significant declines throughout the Greater Yellowstone Area, with potentially hundreds of thousands of acres affected. AR 43535. The Service predicts whitebark pine may suffer "local extinction and reduced overall distribution in the [Greater Yellowstone Area," but some wil-

derness areas in the eastern DPS are expected to suffer fewer declines. AR 11338.

Based on this information, the Service stated that "the specific amount of decline in whitebark pine distribution and the rate of this decline are difficult to predict with certainty. *The specific response of grizzly bears ... is even more uncertain.*" AR 11338 (emphasis added). Nonetheless, the Final Rule goes on to conclude that, even given the relationship between grizzly bear survival and whitebark pine availability, grizzly bears will not be threatened by the loss of whitebark pine. *Id.* The Service argues the bears will adapt because they are opportunistic omnivores, and because there are already some years when whitebark pine is not widely available and bears must find alternate food sources. AR 11338–39. The Final Rule also points to on-going monitoring efforts to assess the decline of whitebark pine and the impacts on grizzly bears. AR 11339.

While a court must defer to an agency's interpretation of science when reasonable, *McNair,* 537 F.3d at 983, there is a disconnect between the studies the agency relies on here and its conclusions. In its briefs to this Court, the Service downplays the relationship between whitebark pine and grizzly bear survival, asserting that the best available science shows there is not as strong a relationship as once thought. However, the studies relied on by the Service belie this claim. These studies still state that there is a connection between whitebark pine and grizzly survival: "[t]he relationship between whitebark cone production and increased bear mortality has been well documented ... and our results provide additional support." AR 22073. The Service's own scientists recognize that, while grizzlies' other primary foods are not related to grizzly bear survival, there is a connection between whitebark pine and grizzly survival, al-

though the extent of the relationship is not clear. AR 05565.

The agency has not articulated a rational connection between the best available science and its conclusion that bears will not be affected by declines in whitebark pine because they are omnivorous. While the Final Rule emphasizes that grizzly bears will be able to adapt to the decline of whitebark pines, the record contains scant evidence for this proposition. For example, one study the Service relies on notes the variability in bears' diets. Yet the same study also raises concerns about losses of whitebark pine and impacts to grizzly bears. AR 21015–17. Another study cited by the Service to support its position actually indicates the opposite. AR 35271–273. It states that when pine nuts are not available, "bears respond by substituting lower quality foods.... In the face of a shortfall in nutritious foods, bears move widely in search of food, which may bring them into contact with humans [and] substantially increases the risk of direct human-caused mortality." AR 35272. The study concludes that the characteristics of grizzly bears "do[ ] not provide much resiliency in human-dominated landscapes." AR 35273.

The Final Rule also notes that whitebark pines are expected to persist in some eastern parts of the Greater Yellowstone Area, and uses this fact to support the argument that whitebark pine declines will not impact grizzly bears. AR 11339. Even so, the Final Rule cites no science to indicate that remaining whitebark pines in a portion of the DPS boundaries will compensate for other declines. Further, the Service's assurances in the Final Rule that it will continue to monitor whitebark pine declines and the impacts on grizzlies, while laudable, fails to support the conclusion that bears will not be negatively impacted by the loss of whitebark pines.

The Service argues that grizzly bear numbers have been increasing, even given recent whitebark pines decreases and contends that this demonstrates the bears will adapt to further losses. This argument is perhaps the best support the agency has for its conclusion that grizzly bears will adapt as their food sources change. However, there are two problems with the argument. First, the Service did not rely on this rationale in the Final Rule, and the Court will not defer to new positions advocated by the Service as part of litigation which did not form the basis for the decision. *See Bowen v. Georgetown University Hospital,* 488 U.S. 204, 212–13, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Second, as the Plaintiff points out, several studies in the record note that short-term population growth may mask a longer-term problem associated with a slow decline in habitat. AR 20703; AR 22074. As one study relied on by the Service notes, if whitebark pines suffer a slow decline, it may be difficult to detect short-term changes in the survival rates of bears. AR 22074. The Service offers nothing to refute this argument.

Deference to an agency's scientific expertise is mandated when the agency articulates a rational connection between the facts and its conclusion. *Ocean Advocates,* 361 F.3d at 1119. The science relied on by the Service does not support its conclusion that declines in the availability of whitebark pine will not negatively affect grizzly bears. In fact, much of the cited science directly contradicts the Service's conclusions. While the agency's discretion is broad in its area of expertise, the discretion is not unlimited. The record supports the Service's own statements that the extent of declines in whitebark pine and the grizzlies' response is "uncertain." AR 11338. Where the agency's conclusions contradict the science, the conclusions are not reasonable and the Court need not defer to the agency's decision. *McNair,*

537 F.3d at 983. Such is the case here. The Plaintiff is entitled to summary judgment in its favor on Count III of the Complaint.

**D.** *Genetic diversity and population size*

Plaintiff next asserts the delisting decision violates the ESA because it is based on an unacceptably small population size and contemplates translocating grizzly bears into the Greater Yellowstone Area to maintain adequate genetic diversity in the Yellowstone DPS. The Plaintiff argues the best available science shows the Yellowstone DPS remains threatened because it does not have sufficient genetic diversity to maintain long-term sustainability. The Service responds that the Yellowstone DPS has adequate genetic diversity to maintain it in the near future and that possible translocation of bears into the DPS is an acceptable management technique.

The Final Rule analyzes population size and genetic diversity as a possible "natural or manmade factors affecting [the grizzly bears'] continued existence." 16 U.S.C. § 1533(a)(1)(E). As the parties agree, the Yellowstone grizzly bear population has been genetically isolated for approximately a century and is less genetically diverse than other grizzly bear populations. AR 11287. The lack of genetic diversity among grizzly bears was one reason for listing the grizzly bear as a threatened species in the first place. 40 Fed.Reg. 31734. The Final Rule recognizes that over time, the isolated Yellowstone DPS may suffer declines in genetic diversity that could affect the population. AR 11335.

Plaintiff argues the best available science shows a larger population is necessary to avoid negative consequences from lack of genetic diversity and that the only solution is to re-establish connectivity with

other populations. However, in the Final Rule, the Service relies on studies suggesting that the Yellowstone grizzly population can avoid negative genetic consequences in the near future by maintaining an effective population size [4] of 100 individuals, which is likely to exist in a total grizzly population size of around 400 bears. AR 11335. The Service estimates that maintaining the population at least at its current size of 500 is a conservative approach to ensuring an adequate effective population size. *Id.* Recent studies indicate that genetic diversity is not as limited as previously thought among the Yellowstone grizzly bear population. *Id.* The science relied upon by the Service also indicates that any genetic concerns will not arise in the near future: "it unlikely that genetic factors will have a substantial effect on the viability of the Yellowstone grizzly over the next several decades." AR 27173. While the Plaintiff points to studies suggesting that a larger population is necessary,[5] the Plaintiff does not show why the agency cannot or should not rely on the science discussed above as the best available science. The Court must defer to the agency's area of expertise in estimating an adequate population size because the Service has provided a reasonable explanation for its conclusions. *McNair,* 537 F.3d at 983.

The Service has admitted the need to maintain genetic diversity in the future by introducing bears from outside populations. AR 11335–36. The 1993 Recovery Plan recognized that linking populations of grizzly bears is desirable, but concluded that linkage is "not essential for delisting." AR 32789. It also contemplated the possibility of translocating bears into the Yellowstone population to enhance genetic diversity. AR 32792. The Final Rule proposes translocating one to two individuals per generation beginning in 2020 if natural connectivity is not restored.[6] AR 11336. While Plaintiff argues that natural connectivity is required, the 1993 Recovery Plan explicitly noted that it was not essential.

Plaintiff argues the management technique of translocation demonstrates the DPS is not adequately recovered because artificial addition of bears is needed to maintain the population in the future. In support of this argument, Plaintiff relies on *Trout Unlimited v. Lohn,* 2007 WL 1795036 (W.D.Wash. June 13, 2007). In *Trout Unlimited,* the District Court stated that:

> [T]he purpose of the ESA is to promote populations that are self-sustaining without human interference.... The protection of the ecosystems upon which endangered and threatened species depend is explicitly recited as the statute's purpose.... If the ESA did not require that species be returned to a state in

---

**4.** An effective population size is "the number of breeding individuals in an idealized population that would show the same amount of change in allele frequencies due to random genetic drift or the same amount of inbreeding as the population under consideration." AR 11335.

**5.** Plaintiff also notes a response to comments by the Service which states the Yellowstone population is not large enough for evolutionary success. AR 11304. However, Plaintiff takes this comment out of context. The Service stated that the population is "lower than recommended ... in the absence of manage-

ment." *Id.* The comment goes on to state that the plans to enhance genetic diversity will address the concerns about the population size. *Id.*

**6.** While the Service and Plaintiff agree connectivity is desirable, the Service suggests there are "substantial" obstacles. AR 03007. The Service points to its efforts to re-establish linkage between populations, but its own report on linkage zones does not include a discussion of linkage with the Yellowstone population. AR 30354–30436. It appears extremely unlikely that natural connectivity will occur in the foreseeable future.

which they were naturally self-sustaining, preservation of the habitat of the species would be unnecessary.

*Id.* at *15. Plaintiff argues the same reasoning applies here: because the Final Rule admits the Yellowstone DPS is not self-sustaining, it should not be delisted. After briefing in this case, the Ninth Circuit reversed the district court's decision in *Trout Unlimited.* *Trout Unlimited v. Lohn,* 559 F.3d 946 (9th Cir.2009). The Circuit concluded that it was proper to consider the status of hatchery fish in making a listing determination because the agency considered both the positive and negative effects hatchery fish could have on the natural population. *Id.* at 957–58. Based on the Ninth Circuit's recent opinion, the Plaintiff's reliance on the district court decision in *Trout Unlimited* is unavailing.

As in *Trout Unlimited,* the Service here conducted its analysis regarding grizzly bear translocation "in a thoughtful, comprehensive manner that balanced the agency's concerns and goals" regarding genetic diversity. *Id.* at 959. The Service relies on studies which conclude that genetic diversity does not pose a problem at this time: "The viability of the Yellowstone grizzly bear is unlikely to be compromised by genetic factors in the near future." AR 27173. The primary study relied on by the Service also suggests translocation as a management tool for improving genetic diversity, but emphasizes that the need for gene flow between populations "is not urgent." *Id.* Based on this study, which Plaintiff does not challenge, genetic concerns do not show that the Yellowstone grizzly bear remains threatened because the population is not "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

The Service recognizes that the logistics of translocating grizzly bears present challenges. The Final Rule suggests translocating bears from the Northern Continental Divide Ecosystem because it is a genetically diverse population. However, this population of grizzly bears is also endangered, and the Final Rule does not address the consequences of taking bears out of an endangered population. As the Service recognizes, it is likely to take several bears to yield one to two successful migrants into the Yellowstone DPS population. AR 11336. Plaintiff argues these uncertainties show the plan to translocate bears is unworkable and violates the ESA. However, these possible future logistical issues fail to show the Yellowstone DPS is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

The Service has provided a reasonable explanation for its conclusions about genetic diversity and population size, and the concerns about long-term genetic diversity do not warrant a continued threatened listing for the Yellowstone DPS. The Defendants are entitled to summary judgment in their favor on Count IV of the Complaint.

**E.** *Interpretation of the statutory phrase "significant portion of its range"*

Last, Plaintiff argues the Service failed to properly evaluate whether the grizzlies are recovered across a significant portion of their range. Plaintiff claims the Service erred because it did not consider the grizzly bears' historic range, most of which grizzly bears no longer occupy. The Service responds that it has applied a rational interpretation of an ambiguous statutory provision that is entitled to deference by the Court and that is has supplied adequate rationale to support its interpretation.

Prior to the delisting decision, the Yellowstone grizzly bear DPS was listed as a

threatened species. "The term 'threatened species' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).[7] The phrase "significant portion of its range" is inherently ambiguous. *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir.2001). As such, the agency is entitled to deference in its interpretation of the term if the agency articulates a reasoned basis for its decision and articulates a rational connection between the facts and the decision it has made. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Ninth Circuit has interpreted this statutory phrase as follows:

> We conclude, consistently with the Secretary's historical practice, that a species can be extinct "throughout ... a significant portion of its range" if there are major geographical areas in which it is no longer viable but once was. Those areas need not coincide with national or state political boundaries, although they can. The Secretary necessarily has a wide degree of discretion in delineating "a significant portion of its range," since the term is not defined in the statute.

*Defenders of Wildlife*, 258 F.3d at 1145. In *Defenders of Wildlife*, the Ninth Circuit reversed a decision that declined to list the flat-tailed horned lizard as threatened because the agency had not adequately considered the "significant portion of its range" language. The lizard was extirpated from a large portion of its historical range and faced continuing threats on private land which constituted part of its range, but the agency found that the liz-

ard's range on public land was sufficient to prevent listing. *Id.* at 1138, 1140.

While the Court rejected the agency's argument that it could examine only range on public land, it also rejected the plaintiffs' assertion that a species must be listed only because it no longer inhabits a certain percentage of its historical range. Criticizing the plaintiffs' quantitative approach, the Ninth Circuit stated:

> [I]t simply does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing. A species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat. Similarly, a species with an exceptionally small historical range may quickly become endangered after the loss of even a very small percentage of suitable habitat.

*Id.* at 1143. However, the Court also emphasized that if a species has lost a large portion of its historical range, the agency "must at least explain [the] conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" *Id.* at 1145 (citing *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159 (9th Cir.1980)). Applying similar reasoning, the Court in *Center for Biological Diversity v. Norton*, 411 F.Supp.2d 1271 (D.N.M.2005), upheld a decision not to list the Rio Grande Cutthroat Trout based in part on the agency's interpretation of "significant portion of its range." *Id.* at 1283. That court found the agency's interpretation reasonable where it had concluded that even if "lost habitat may be numerically or geographically large" it may not be "biologically significant because the species' survival is not

---

**7.** The Plaintiff incorrectly cites 16 U.S.C. § 1532(6) when referring to the term "significant portion of its range." This statutory provision defines endangered rather than threatened species. However, the phrase is identical in both provisions.

threatened by the shrinkage in habitat." *Id.*

Several other courts have construed the statutory phrase "significant portion of its range" in connection with the designation of a DPS. For example, two different courts found the agency violated the ESA in its interpretation of the phrase as applied to gray wolf DPS's. *Defenders of Wildlife v. Secretary,* 354 F.Supp.2d 1156 (D.Or.2005); *Natl. Wildlife Federation v. Norton,* 386 F.Supp.2d 553 (D.Vt.2005). In both cases, the Courts concluded the agency had discounted as insignificant any range outside the wolves' current core populations. *Defenders of Wildlife,* 354 F.Supp.2d at 1167; *Natl. Wildlife Federation v. Norton,* 386 F.Supp.2d at 566. As the Oregon District Court reasoned: "By ruling out all other portions of the wolf's range because a core population ensures the viability of a DPS, the Secretary's interpretation 'has the effect of rendering the phrase [significant portion of its range] superfluous.'" *Defenders of Wildlife,* 354 F.Supp.2d at 1168 (quoting *Defenders of Wildlife,* 258 F.3d at 1142).

Here, the Final Rule sets forth the Service's definitions of what constitutes "range" and what is "significant." "Range" includes only current range, not historical range. Interestingly, and perhaps editorially, the Final Agency Rule dismisses the analysis in *Defenders of Wildlife,* stating that the Ninth Circuit had included historical range in its interpretation of range "without any analysis or explanation."[8] AR 11319. The Final Rule also notes that historical range may be helpful to determining if a species is in danger of extinction. *Id.*

The Service defines "significant" based on a variety of factors that indicate the importance of the range to the species survival and the preservation of the species' ecosystem. The term is not based on any present or quantitative measurement of range. AR 11319–20. The Final Rule lists several relevant factors for the agency to consider in determining what is a significant portion of the grizzly bears' range, including quantity, quality, and distribution of habitat, historical value of habitat to the species, frequency of use of the habitat, and uniqueness or importance of the habitat (such as for feeding, migration, etc.). AR 11320. The agency explained that it excluded some historical habitat in the DPS that is not biologically suitable today for grizzly bears. This includes urban and suburban areas and eastern prairie environments because the historic source of food in prairie riparian areas, bison carcasses, is no longer available. AR 11320–21. The Service also analyzed other areas within the DPS where grizzly bears have a high risk of mortality based on conflicts with humans. In particular, the Service concluded that sheep grazing allotments in Wyoming were not suitable habitat for grizzly bears within the DPS. Ultimately, the Service identified all the DPS areas that it believes constitute suitable habitat for grizzlies, an area that is roughly 24% of the land within the DPS boundaries, about 68% of which is currently occupied by grizzly bears. AR 11322. Of this area, 51% is within the Primary Conservation Area, which the Service states will provide for the primary needs of the grizzly bears and serve as a base for expanding into other areas. AR 11323.

---

**8.** While the Service may wish to ignore the Ninth Circuit's interpretation of "range," this Court is bound to follow the ruling of the Ninth Circuit. *Yong v. INS,* 208 F.3d 1116, 1119, n. 2 (9th Cir.2000). However, the Final Rule discusses why some of the historical range is excluded from the analysis, so the Service's explanation is not inconsistent with *Defenders of Wildlife.*

Based on its analysis of suitable and unsuitable habitat, the Service concluded that only the suitable habitat constituted a significant portion of the grizzlies' range. Further, the Service concluded the unsuitable habitat is not a significant portion of the range and "lack of occupancy in unsuitable habitat will not impact whether this population is likely to become endangered within the foreseeable future throughout all or a significant portion of its range." AR 11323.

■■■ Plaintiff criticizes the Final Rule because the Service did not consider that the grizzly bear has been extirpated from 98–99% of its historic range in determining what portion of the range is significant. However, this is the same quantitative method argument that the Ninth Circuit has rejected. *Defenders of Wildlife*, at 258 F.3d at 1143. This case deals with a distinct population segment of grizzlies, which by definition is a discrete segment of the entire species, so it would be nonsensical to require the Service to consider the grizzlies' historic range throughout the United States as significant in relation to the Yellowstone grizzly bear. Even though the grizzly bear has lost a large percentage of its former habitat, the habitat loss may not be "biologically significant" if the Yellowstone DPS does not remain threatened by the losses. *Center for Biological Diversity*, 411 F.Supp.2d at 1283.

The Final Rule sets forth reasons why the suitable habitat, particularly the Primary Conservation Area, is a significant portion of the grizzly bears' range and will continue to provide adequate range for them. Unlike the agency decision in *De-fenders of Wildlife*, 258 F.3d at 1138, 1140, which excluded analysis of private land, the Service analyzed whether private land in the DPS is significant. Further, consideration was given to potential expansion of grizzlies onto some private land. The Service provides reasons why unsuitable habitat within the DPS is an insignificant portion of the bears' range, including a lack of adequate food sources, such as bison, and high potential for human conflicts that lead to increased bear mortality. Although the Service excluded much of the grizzly bears' historic range from the analysis, the Final Rule does provide a reasoned explanation for the conclusion that unsuitable habitat is not a significant portion of the bears' range. *See Id.* at 1145.

Plaintiff also briefly argues the Service should have considered historic range of the grizzly bear in assessing possible corridors to link the Yellowstone DPS to other grizzly populations. However, as the Service points out, habitat outside the DPS remains protected under the ESA because all other grizzly populations are still threatened. The Final Rule reasons that suitable habitat is that which is contiguous with current habitat so as to allow bears to re-colonize it. AR 11321. Thus, the Service's discussion of habitat and range provides a rational explanation for not including possible transportation corridors in its analysis.

The Service's definitions of "range" and "significant" avoid the weaknesses noted by other courts in applying the phrase to a DPS.[9] The Service defined what constitutes a significant portion of the Yellow-

---

9. There seems to be an inherent tension between the idea of a "distinct population segment," which is by definition geographically limited and the requirement to consider a significant portion of the species' range. On one hand, it is illogical to consider the entire historical range of a species when assessing a discrete segment of the species. However, it is equally illogical to establish a DPS and state that the only range significant to its survival is where it exists currently. Under such an interpretation, the Service could remove virtually any species from the threatened and endangered list simply by designating it a DPS.

stone DPS's range, roughly the area where the bears currently exist. This employs similar reasoning to that rejected in *Defenders of Wildlife*, 354 F.Supp.2d 1156, and *Natl. Wildlife Federation*, 386 F.Supp.2d 553. By defining "significant portion of range" based on the DPS boundaries, the Service's definition potentially renders the phrase "superfluous." *Defenders of Wildlife*, 354 F.Supp.2d at 1168. However, this case is distinguishable because the Service has included additional range, outside the bears' current range, where they may expand in the future. The Final Rule states that only 68% of the suitable habitat is currently occupied, and the remainder includes a mix of public and private lands that can provide range for a growing population in the Yellowstone DPS. AR 11321–23.

The agency has offered a reasonable interpretation of the ambiguous phrase "significant portion of its range." The Final Rule offers an explanation for why some areas were not considered significant and sets forth factors to determine significant range, which the Service analyzed in its discussion of suitable habitat in the DPS. Because the Service has offered a reasonable explanation, the Court must defer to the agency's interpretation of the statute. *Chevron, U.S.A., Inc.*, 467 U.S. at 843–44, 104 S.Ct. 2778. The Defendants are entitled to summary judgment in their favor on Count IV of the Complaint.

**F. *Remedy***

 Injunctive relief is the appropriate remedy for a violation of the ESA where the violation poses a threat of jeopardizing or eradicating a species. *Tenn. Valley Authority v. Hill*, 437 U.S. 153, 173–174, 193–94, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). *See also Defenders of Wildlife*, 354 F.Supp.2d at 1174 (enjoining a decision to delist a gray wolf DPS because "the Final Rule permitted lethal and non-lethal harm" to the wolf). However, a court has

discretion to deny injunctive relief even where there is a violation of a statute if the violation will not cause irreparable injury. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 320, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

 The Final Rule in this case does not demonstrate that the Conservation Strategy and states plans are adequate regulatory mechanisms to maintain a recovered grizzly bear population. Without the protections of the ESA, the Yellowstone grizzly bear DPS will be placed in jeopardy. In addition, the record fails to support the Service's conclusion that whitebark pine declines do not pose a threat to the Yellowstone grizzly bear DPS. The record shows the opposite: that declines could jeopardize grizzly bear survival. Because harm to the grizzly bear is likely to occur if the DPS is delisted, injunctive relief is appropriate.

## V. Conclusion

IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment (dkt. # 42) is GRANTED IN PART and DENIED IN PART. It is GRANTED as to Counts I and III of Plaintiff's complaint, and it is DENIED in all other respects.

IT IS FURTHER ORDERED that Defendants' and Defendant–Intervenors' motions for summary judgment (dkt. # 47, 50, 54, 57, 59) are GRANTED IN PART and DENIED IN PART. The motions are GRANTED as to Counts II and IV of Plaintiff's complaint, and they are DENIED in all other respects.

IT IS FURTHER ORDERED that the U.S. Fish and Wildlife Service is ENJOINED from removing the Yellowstone grizzly bear DPS from the list of threatened species. The Final Rule designating the Yellowstone DPS and removing the Yellowstone grizzly bear DPS from the list of threatened species, 72 Fed.Reg. 14866

(Mar. 29, 2007), is VACATED and RE-MANDED to the Service.

The Clerk of Court is directed to (1) enter final judgment in favor of Plaintiff and against Defendants/Defendant–Intervenors on Counts I and III of Plaintiff's Complaint; (2) enter final judgment against Plaintiff and in favor of Defendants/Defendant–Intervenors as to the remaining Counts of Plaintiff's Complaint; and (3) close this case.